**RHODE ISLAND MEDICAL SOCIETY; Pablo Rodriguez; Benjamin S. Vogel; and Planned Parenthood of Rhode Island, Plaintiffs,**

v.

**Sheldon WHITEHOUSE, Attorney General of the State of Rhode Island, in his Official Capacity, and Lincoln C. Almond, Governor for the State of Rhode Island, Defendants.**

C.A. No. 97–416L.

United States District Court, D. Rhode Island.

June 23, 2004.

Lynette J. Labinger, Roney & Labinger, Providence, RI, Catherine Weiss, Louise Melling, Caitlin Borgmann, Talcott Camp, New York, NY, for plaintiffs.

Rebecca Tedford Partington, Providence, RI, for defendant.

Claire J.V. Richards, Providence, RI, for intervenor-defendant.

Joseph S. Larisa, Jr., Esq., Providence, RI, for movant.

### MEMORANDUM AND ORDER

LAGUEUX, Senior District Judge.

This matter is before the Court on objections to the attached Report and Recommendation of Magistrate Judge Robert W. Lovegreen, regarding his assessment of attorneys' fees properly due Plaintiffs as prevailing parties in the instant litigation pursuant to 42 U.S.C. § 1988. Following the appeal of this matter to the First Circuit, Plaintiffs, Rhode Island Medical Society, Pablo Rodriguez, Benjamin S. Vogel, and Planned Parenthood of Rhode Island, filed two motions for attorneys' fees and costs incurred during the course of this litigation in the District Court and on appeal. Plaintiffs' motions were referred to Magistrate Judge Lovegreen for preliminary review, findings, and a recommended disposition. *See* 28 U.S.C. § 636(b)(1)(B); Local Rule 32(c). The magistrate judge held a hearing on these motions July 10, 2003, and after hearing argument and reviewing the written materials submitted, he made the following recommendations regarding Plaintiffs' motions for attorneys' fees and costs: (1) For legal work performed in the District Court, the ACLU–RFP attorneys (Attorneys Weiss, Borgmann, and Camp) were entitled to a total of $234,416.68 in fees and costs, and, as local counsel, Attorney Labinger was entitled to a total of $48,707.94. (2) For legal work performed in the First Circuit, the ACLU–RFP attorneys were entitled to a total of $36,000.73 in fees and costs. The magistrate judge recommended no compensation be awarded to Attorney Labinger for legal work performed at the appellate level. Thus, the magistrate judge recommended that Plaintiffs be awarded a grand total of $319,125.35 in attorneys' fees and costs.

Despite this large recommended award, Plaintiffs object to the magistrate judge's calculation of attorneys' fees on two grounds. First, Plaintiffs note that, in the course of evaluating the number of hours properly compensable under 42 U.S.C. 1988, the magistrate judge eliminated 319.15 of the hours for which Plaintiffs' attorneys sought compensation for their work in this Court, and 162.51 of the hours for which Plaintiffs' attorneys sought compensation in the First Circuit. Plaintiffs object to the elimination of 183.07 hours in this Court and 85.83 hours eliminated for appellate work, arguing that these reductions were unjustified, and should be reinstated. Second, Plaintiffs' lead counsel from the ACLU–RFP based in New York City object to the magistrate judge's imposition of Rhode Island rates for their services. These out-of-state lawyers argue that New York rates are appropriate for their legal work on this case, and ask the Court to revise the award on this basis.

■ Review of a magistrate judge's Report and Recommendation is *de novo*. *See* 28 U.S.C. § 636; Local Rule 32(c)(2). After reviewing the record, hearing argument on Plaintiffs' objections and considering the memoranda submitted by the parties, this Court adopts the disposition recommended by the magistrate judge, subject to one revision. As described further below, the Court reinstates 6.5 of the hours eliminated by the magistrate judge for time spent preparing four First Circuit status reports by Attorney Borgmann, because the claimed time, as now explained by Plaintiffs in their objection to the magistrate judge's recommendation, was both necessary and reasonable. However, this writer concludes that all of the magistrate judge's other recommended reductions and eliminations were warranted, and specifically adopts his determinations in this regard. In addition, the Court agrees

with the magistrate judge that local Rhode Island rates are appropriate for the ACLU–RFP attorneys involved in this case, and, as further described herein, refuses to impose New York City rates for the services rendered by Attorneys Weiss, Borgmann, and Camp in this litigation.

## I. Calculating Attorneys' Fees

In calculating the correct amount of attorneys' fees, district courts in this Circuit are required to employ the "lodestar" approach. *Yankee Candle Co. v. Bridgewater Candle Co., LLC,* 140 F.Supp.2d 111, 123 (D.Mass.2001); *see also Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 295 (1st Cir.2001); *Maceira v. Pagan,* 698 F.2d 38, 39 (1st Cir.1983). Under this method, the district court must calculate the "lodestar," or the "reasonable hourly rate for each attorney and for the type of work he or she performed" and, after performing any necessary adjustments, multiply the adopted rate times the number of hours each attorney "reasonably worked" on the case, with the understanding that in some cases the number of hours reasonably spent on a case may be less than the number of hours actually worked. *Maceira,* 698 F.2d at 39 (noting that, under the lodestar approach, "[t]he final figure combines reasonably objective market factors with the court's own perception of the litigation"). The First Circuit has described the calculation as follows:

> In implementing this lodestar approach, the judge calculates the time counsel spent on the case, subtracts duplicative, unproductive, or excessive hours, and then applies prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved).

*Gay Officers,* 247 F.3d at 295 (citing *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir. 1992)).

Thus, when awarding attorneys' fees under 42 U.S.C. § 1988, this Court must first determine the number of hours reasonably spent by each attorney in this litigation, eliminating any hours that are, in the Court's judgment, "duplicative, unproductive, or excessive," and then must multiply that figure times the reasonable hourly rate the court deems appropriate for such legal work. *Id.* Reasonable hourly rates have been defined as "prevailing rates in the community for comparably qualified attorneys." *Lipsett,* 975 F.2d at 937; *Andrade v. Jamestown Housing Authority,* 82 F.3d 1179, 1190 (1st Cir.1996). For purposes of attorneys' fees, the relevant community is usually where the court is located. *Gay Officers,* 247 F.3d at 296 (citing *Adcock–Ladd v. Sec'y of Treas.,* 227 F.3d 343, 350 (6th Cir.2000)). As noted by the magistrate judge, the party requesting attorneys' fees bears the burden of providing sufficient documentation to the court to establish the hours and rates sought. Where the provided documentation is inadequate, "the district court may reduce the award accordingly." *O'Rourke v. City of Providence,* 77 F.Supp.2d 258, 263 (D.R.I. 1999) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *see also Tennessee Gas Pipeline Co. v. 104 Acres of Land,* 32 F.3d 632, 634 (1st Cir.1994). Utilizing the standard thus outlined, this writer now turns to the claimed fees at issue.

## II. Reasonable Hours Spent

In calculating the number of compensable hours, it is the Court's function to ascertain the amount of time actually spent on the case by the attorneys involved, "and then subtract from that figure hours which were duplicative, unproductive, excessive,

or otherwise unnecessary." *Lipsett,* 975 F.2d at 937. In other words, the Court must compensate only for those hours that it finds reasonable, taking into account the nature of the litigation and the tasks performed by the attorneys.

Plaintiffs object to the magistrate judge's recommended hour reductions in both the District Court and the Court of Appeals. As to the hours eliminated in the District Court, Plaintiffs lump their objections into two basic assertions as to where they allege the magistrate judge erred: (1) "Failure to recognize that preliminary injunction hearings (or depositions) were scheduled," and (2) "Failure to recognize the scope of reply necessary in second round preliminary injunction papers." Regarding hours the magistrate judge eliminated in the First Circuit, Plaintiffs base their objection on the magistrate judge's "[m]isunderstanding of the issue on appeal." These specific objections will be discussed in turn.

A. Eliminated Hours Prior to Scheduled Proceedings

Plaintiffs specifically object to three instances where the magistrate judge eliminated hours Attorneys Borgmann and Camp spent drafting practice questions and engaging in witness preparation prior to scheduled preliminary injunction hearings and/or depositions, which were later cancelled.[1] The total time objected to on this basis for work done in the District Court is 45 hours. Plaintiffs argue that the magistrate judge's eliminations were improper because he failed to comprehend that hearings and depositions were scheduled at the time the work was performed. Defendants argue that the described work was insufficiently described in Plaintiffs' affidavits and contemporaneous records to merit an award. In addition, Defendants argue that Attorney Borgmann's hours spent drafting practice hearing questions were unnecessary, as these questions had already been drafted for proceedings in previous litigation.

 After reviewing the record, this writer concludes that these hours were properly eliminated by the magistrate judge because of Plaintiffs' incomplete billing records. As noted above, Plaintiffs, as those seeking attorneys fees, bear the burden of providing sufficient documentation to establish the fee award sought. *O'Rourke,* 77 F.Supp.2d at 263. To secure an award from the district court, documentation of attorneys' fees must be contemporaneous with the work performed. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). In addition, as the magistrate judge observed, in order for the district court to properly evaluate attorneys' fees, the documentation provided must be full and specific, offering a description of both the time spent and the subject matter of the task performed. *Tennessee Gas Pipeline Co.,* 32 F.3d at 634. In the absence of such detailed information, it becomes impossible for the court to "gage whether the task performed was warranted" or "determine if the time factor allocated was appropriate or excessive." *Id.* Thus, where documentation is inadequate to support the claimed award, it must be

---

1. Specifically, Plaintiffs object to 21 hours (10.5 + 10.5) recorded by Attorney Borgmann in July, 1997 and September–October, 1998; and 24 hours recorded by Attorney Camp in July of 1997. Attorney Borgmann's eliminated hours were apparently spent drafting practice questions for scheduled preliminary injunction hearings that were later cancelled. The witnesses involved and the subject matter of the prepared questions both remain uncertain. Attorney Camp's eliminated hours were apparently devoted to preparing an expert witness for a hearing or deposition originally scheduled in August 1997, which was later postponed or cancelled.

eliminated. *O'Rourke,* 77 F.Supp.2d at 263.

Here, Plaintiffs complain that the hours eliminated by the magistrate judge were properly spent preparing witnesses for "hearings (or depositions)" that were scheduled at the time. The magistrate judge disallowed this time because he was unable to determine what witnesses were being prepared and what proceedings were pending. After reviewing Plaintiffs' contemporaneous records and supporting affidavits, this writer continues to wonder exactly what witnesses were being prepared in some instances, and, where that is supplied, what proceedings were involved. For example, Plaintiffs' object to hours eliminated for time they claim that Attorney Borgmann spent "drafting direct and practice cross-examination questions for witnesses to testify at the preliminary injunction-hearing scheduled for early August 1997." *See* Plaintiffs' Objection, at 5. However, the contemporaneous records provided describe this time—without context—as "Located and reviewed Mich. questions and cross-examinations for possible questions; began to draft questions," "Drafted witness questions," "Drafted and revised witness questions," and "Worked on witness questions." No references exist in Plaintiffs' contemporaneous records or the affidavits submitted to identify what witnesses were at issue, the subject matter of the questions prepared, or the proceeding prepared for. Similarly, Plaintiffs object to hours eliminated that Attorney Camp spent preparing Dr. Stubblefield for his testimony in July 1997. In their objection to the magistrate judge's report, Plaintiffs argue that these hours were spent preparing Dr. Stubblefield for a

*hearing* scheduled in August 1997. However, Attorney Camp's contemporaneous records attribute these hours to time spent preparing for Dr. Stubblefield's *deposition,* which did not occur until January 1999.[2] Although Plaintiffs seem to suggest that some depositions were scheduled, and then cancelled, they have not described for the Court which depositions these were. Under these circumstances, it is unclear what proceeding Plaintiffs were preparing for, and thus, whether the time spent was warranted. This writer is satisfied that these hours were appropriately eliminated by the magistrate judge.

**B. Reduced Hours on Plaintiffs' Reply Brief**

Plaintiffs also object to 73.82 of the hours eliminated by the magistrate judge, arguing that these hours were inappropriately removed due to the magistrate judge's failure to comprehend "the scope of reply necessary" in their reply to Defendant's Objection to Plaintiffs' second Motion for Preliminary Injunction (filed after the Rhode Island law in question was amended). The magistrate judge's reductions in this regard reflect his opinion that much of the time Plaintiffs' attorneys spent on their second round reply brief was excessive and unreasonable, especially in light of the considerable time these attorneys reported for their earlier submissions. Plaintiffs attempt to counter the reductions by pointing out that Defendants filed a sixty page objection to Plaintiffs' motion, and attached to this, hundreds of pages of affidavits and exhibits. Faced with such a lengthy objection, Plaintiffs argue that they considered themselves

---

**2.** The Court also notes that any work Attorney Camp performed preparing for Dr. Stubblefield's deposition in July 1997 was later duplicated by Attorney Borgmann during November 1998 and January 1999, as she prepared for and then participated in the Stubblefield deposition in January 1999. Thus, Attorney Camp's time was also properly eliminated on this ground.

"obligated to respond in kind" when generating their reply brief. It is Plaintiffs' contention that the magistrate judge failed to recognize the volume and scope of their reply brief, and they ask this Court to restore the eliminated hours to the award.

■ In objecting to the magistrate judge's reductions, Plaintiffs ask the Court to compensate them for all the hours spent on their voluminous reply submissions. However, as Judge Lovegreen properly noted, the lodestar amount for attorneys' fees hinges not on the number of hours actually worked, but rather on "the number of hours *reasonably* expended on the litigation[.]" *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933 (emphasis added). Determining what hours are reasonable requires an independent evaluation by the court. As the First Circuit has noted:

> In fashioning fee awards, the attorneys' contemporaneous billing records constitute the usual starting point, but the court's discretion is by no means shackled by those records. For example, it is the court's prerogative (indeed, its duty) to winnow out excessive hours, time spent tilting at windmills, and the like.

*Gay Officers*, 247 F.3d at 295–96.

Thus, in calculating the lodestar amount, it is appropriate for the court to eliminate those hours that it deems excessive or duplicative. In doing so, this Court is entitled to exercise its discretion as to the amount of time reasonable to perform the task described. *Sherwood Brands of Rhode Island, Inc. v. Smith Enterprises, Inc.*, 2002 WL 32157515 at *2 (D.R.I.2002) ("The District Court may calculate the lodestar amount based upon its own estimation of reasonable time necessary to perform tasks at issue . . . ."); *see also Grendel's Den, Inc.*, 749 F.2d at 953–54 ("[A] litigant is entitled to attorneys fees under 42 U.S.C. § 1988 for an effective

and completely competitive representation but not one of supererogation.").

■ Here, after reviewing Plaintiffs' submissions, this writer concludes that the magistrate judge's time reductions were appropriate. In each instance where Plaintiffs object, the magistrate judge reduced or eliminated hours to reflect his estimation of the time necessary to perform the task at issue. The Court agrees with the magistrate judge that much of the attorneys' time spent on reply submissions was excessive, especially in light of the effort previously expended in the original motion papers. Like the magistrate judge, this writer does not doubt that Plaintiffs' attorneys accurately reported the number of hours actually spent performing these tasks. However, when awarding attorneys' fees it is the district court's duty to compensate only for those hours that it can, in its own judgment, say were reasonable under the circumstances. This writer concurs with the magistrate judge that the reported hours on the reply brief were excessive, and approves his recommended reductions/eliminations in this regard.

### C. Reduced Hours in the First Circuit

■ Plaintiffs' third specific objection relates to hours the magistrate judge eliminated for work performed when the case was in the First Circuit. As grounds for their objection, Plaintiffs suggest that the magistrate judge improperly eliminated these hours because he misunderstood the issue on appeal. According to Plaintiffs, Defendants attempted to argue the concept of severability on appeal while improperly couching it in terms of standing. While standing had been raised previously in the district court, Plaintiffs argue, Defendants' severability argument had not been advanced below. Plaintiffs ask this

Court to compensate them for the additional hours spent countering this novel appellate argument by reinstating those hours the magistrate judge eliminated for work performed in the First Circuit.

After reviewing the magistrate judge's Report and Recommendation, along with the documents presented by the parties, this writer is satisfied that the magistrate judge did not misunderstand the issue Plaintiffs faced on appeal. In outlining the issues presented in this case on appeal, the magistrate judge merely quoted the First Circuit's description. As Judge Lovegreen observed, "the issue before the First Circuit was standing or, as stated by the First Circuit, 'because appellees do not perform any post-viability abortions, they lack standing to challenge the Act as applied to post-viability abortions.'" Report and Recommendation at 55 (citing *Rhode Island Medical Society v. Whitehouse*, 239 F.3d 104, 105 (1st Cir.2001)). As the magistrate judge also observed, the First Circuit noted that the issues Defendants raised on appeal were similar to those raised, briefed, and rejected in the district court. *See id., see also Rhode Island Medical Society*, 239 F.3d at 105 (noting that Defendant's argument on appeal was "a variation of the standing argument that appellant made below—an argument that was rejected"). Thus, the Court agrees with the magistrate judge that the extremely large number of hours expended by Attorneys Weiss, Borgmann, and Camp drafting, revising, editing, managing, and filing their merits brief were both excessive and duplicative under the circumstances. The Court, therefore, considers the reductions in this regard reasonable, and specifically adopts the magistrate

judge's recommendations regarding work performed in the First Circuit, subject to one revision.

The one revision the Court makes to the magistrate judge's recommended reductions concerns status reports that were completed by Attorney Borgmann every sixty days while a stay of appellate proceedings was in effect. Judge Lovegreen eliminated 6.5 hours spent preparing these status reports because he was unsure who they were performed for or why they were necessary. Although Plaintiffs did not sufficiently substantiate the basis for these hours in the documents submitted to the magistrate judge, they have submitted documentation to this Court in the interim demonstrating that the First Circuit required Plaintiffs to submit these reports every sixty days while the stay of proceedings was in effect. *See* First Circuit Order entered Nov. 22, 1999. Attorney Borgmann's records reflect a total of 6.5 hours spent compiling four separate status reports. Dividing the total hours worked by the number of reports produced, this amounts to 1.625 hours spent on each report. The Court finds this amount of time to be reasonable under the circumstances, and, as Plaintiffs have now substantiated the hours, this writer restores 6.5 of the hours originally eliminated by the magistrate judge from Attorney Borgmann's work in the First Circuit.[3]

D. Other Objections

Additionally, Plaintiffs object to other reductions in time made by the magistrate judge, arguing that his reductions do not reflect the amount of time actually necessary for Plaintiffs' attorneys to perform

---

[3]. This increases Attorney Borgmann's compensable hours for legal work performed in the First Circuit to 116.5. As a result, her fee award in the First Circuit should be increased by $1,235.00 to compensate for these additional hours. This increases Attorney Borgmann's fee award in the First Circuit to $22,135.00, and the overall award due Plaintiffs for attorneys fees and costs in both courts to $320,360.35.

the task described. After reviewing these reductions, this writer concurs with the magistrate judge that the reported hours were excessive under the circumstances. Again, compensable hours should reflect the amount of time that the Court, after an independent evaluation, deems *reasonable* to accomplish the required tasks. *See Sherwood Brands*, 2002 WL 32157515 at *2. The Court adopts the magistrate judge's recommended reductions in this regard as well.

### III. A Reasonable Hourly Rate

■■■■■ The second prong of the lodestar analysis is determining a reasonable hourly rate for the services rendered. *Lipsett*, 975 F.2d at 937; *Maceira*, 698 F.2d at 39. As stated previously, reasonable hourly rates are the prevailing rates in the relevant community for attorneys with comparable qualifications and experience. *Gay Officers*, 247 F.3d at 295; *Andrade*, 82 F.3d at 1190. Typically, "reasonable hourly rates should be set by reference to rates in the court's vicinage rather than in the lawyer's region of origin." *Gay Officers*, 247 F.3d at 296 (citing *Adcock–Ladd*, 227 F.3d at 350); *see also Williams v. Poulos*, 1995 WL 281451 at *4 (1st Cir.1995). However, as the First Circuit has noted, out-of-town rates are appropriate "if the complexities of a particular case *require* the particular expertise of non-local counsel", *or* "when the case is an undesirable one which capable attorneys within the forum community are not willing to prosecute or defend." *Williams*, 1995 WL 281451 at *4 (citing *Maceira*, 698 F.2d at 40, and quoting 2 Mary Frances Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees*, ¶ 16.03[8] (1994)) (emphasis in original). In ascertaining the rates to be awarded, the district court need not rely on information supplied by the parties, and remains free to utilize its own knowledge of attorneys' fees in the relevant area. *Andrade*, 82 F.3d at 1190; *Phetosomphone v. Allison Reed Group, Inc.*, 984 F.2d 4, 8 (1st Cir.1993).

■■■■ Plaintiffs object to the magistrate judge's recommendation that Rhode Island rates be awarded rather · than the New York City rates sought by Plaintiffs' attorneys. Essentially, Plaintiffs argue that they are entitled to out-of-town rates for their services because 1) Attorneys Weiss, Borgmann, and Camp are experts in the field of reproductive rights, and 2) Plaintiffs were justified in retaining these attorneys as out-of-town experts because no local Rhode Island attorneys possessed comparable knowledge or expertise in mounting facial challenges to statutes banning partial birth abortions. Plaintiffs argue that the complexities of this case, their expertise, and the unavailability of qualified local counsel meet the standards for out-of-town rates established by the First Circuit in *Maceira*, 698 F.2d at 40, and ask the Court to revise the magistrate judge's recommended disposition on this ground. For the reasons described below, ·the Court rejects Plaintiffs' argument and adopts the magistrate judge's conclusion that Rhode Island rates are appropriate.

As the First Circuit observed in *Maceira*, the reasonableness of awarding out-of-town rates "turns on the reasonableness of hiring an out-of-town specialist." *Id.* at 40. As the Court of Appeals stated:

> Where it is unreasonable to select a higher priced outside attorney—as, for example, in an ordinary case requiring no specialized abilities not amply reflected among local lawyers— the local rate is the appropriate yardstick. But, if the client needs to go to a different city to find [a] specialist, he will expect to pay the rate prevailing in that city. In such a case, there

is no basis for concluding that the specialist's ordinary rate is unreasonably high. If one wishes to be literal, the 'prevailing' rate 'in the community' for work performed by an outside specialist (where that outside specialist is reasonable) is most likely to be that outside specialist's ordinary rate[.]

*Id.* at 40.

Thus, before a district court can award out-of-town rates, it must conclude two things: first, that retention of an outside specialist was reasonable under the circumstances, as members of the local bar were unable or unwilling to litigate the matter, and second, that the retained attorney is an expert, or specialist in the required area of law, possessing specialized skills or knowledge that the local bar cannot muster. In determining whether hiring an outside specialist was reasonable, the Court must consider whether the complexities of the case take it beyond the ken of local attorneys, making the skills of an out-of-town specialist necessary. *Williams,* 1995 WL 281451 at *4 (citing *Maceira,* 698 F.2d at 40); *see also Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768 (7th Cir.1982) ("The complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally").

Here, the Plaintiffs brought a facial challenge to the constitutionality of Rhode Island's statutory ban on partial birth abortions. Plaintiffs argue that no attorneys in the local Rhode Island bar were capable of leading this litigation, and, as a result, they were forced to retain outside experts from the ACLU–RFP in New York City. The main piece of evidence Plaintiffs offer in support of their argument is a declaration from their local counsel, Attorney Labinger, which states her belief that she "did not possess sufficient expertise as to the necessary medical knowledge and its interplay with legal precedent to serve as lead counsel in this constitutional challenge and that there was no attorney in Rhode Island who did." *See* Declaration of Attorney Labinger at 4. Although this statement reflects Attorney Labinger's beliefs, it does not support Plaintiffs' contention that no members of the Rhode Island bar were qualified to serve as lead counsel in this case, or that such qualified members were contacted and refused to participate in the litigation. Indeed, this Court has spent many a year as a member of the bench and the bar in this state, and can state with confidence that at least a half-dozen law firms in Providence possessed the requisite legal experience and the necessary knowledge to take on the constitutional issues presented in this case. Although this writer is not aware of a law firm in Providence specifically concentrating its entire practice in the area of reproductive rights, the Court does not consider such an exclusive specialty necessary to litigate the facial challenge mounted in this case. An experienced attorney in a health-related area of law, such as medical malpractice, would be more than able to meet with doctors and other medical personnel and develop the knowledge base necessary to serve as lead counsel in this litigation. This form of preparation is exactly the same as that actually conducted by Attorneys Weiss, Borgmann, and Camp in this case.

The Court agrees with the magistrate judge that many Rhode Island lawyers were competent to handle this case, but, for whatever reason, they were never contacted by Plaintiffs. Instead, Plaintiffs were content to use out-of-town counsel after one member of the local bar opined that she considered herself under-qualified to serve as lead counsel, and was unaware of other more qualified Rhode Island attorneys. Such a showing is inadequate to

establish that outside counsel was required. *See Williams*, 1995 WL 281451 at *4; *Maceira*, 698 F.2d at 40.

Based on the materials submitted, the magistrate judge also concluded that Attorneys Weiss, Borgmann, and Camp, although specialists in the field of reproductive rights, did not possess sufficient experience in mounting a challenge to partial birth abortion bans to make them more expert in this type of litigation than local attorneys in the Rhode Island community. The magistrate judge based his conclusion in part on Plaintiffs' description of this case as a matter of first impression and also in part on the extensive amount of investigative work, research, and hours of preparation Plaintiffs' attorneys performed to successfully challenge Rhode Island's partial birth abortion statute in court. As the magistrate judge noted, the number of hours Plaintiffs' attorneys spent building their knowledge base, preparing themselves and their witnesses, researching the law, and drafting their briefs was excessive for attorneys claiming to be experts in the subject area. The Court recognizes that this was a case of first impression, and that, as such, it required more research and preparation than would an established issue of law. However, this writer agrees with the magistrate judge that Attorneys Weiss, Borgmann, and Camp, while possessing specialized knowledge in the general area of reproductive rights, did not possess enough specialized knowledge in mounting facial challenges to statutory partial birth abortion bans to warrant the imposition of out-of-town rates for their services. As the magistrate judge observed, these attorneys were no more specialists in challenging partial birth abortion bans than were numerous other attorneys in the state, including Plaintiffs' local counsel, Attorney Labinger.[4] As a result, the Court refuses to award Attorneys Weiss, Borgmann, and Camp out-of-town rates for their services in this case. Instead, the Court adopts the magistrate judge's recommended Rhode Island rates for each attorney, as stated in the attached Report and Recommendation.

### Conclusion

Based on the foregoing, the Report and Recommendation is accepted and adopted, subject to one revision regarding attorneys fees for time spent generating status reports in the First Circuit. This revision increases Attorney Borgmann's compensable hours for legal work on appeal to 116.5. To summarize, the following attorneys' fees and costs are adopted and imposed by the Court:

*District Court*

**Attorneys' Fees Awarded:**

Attorney Weiss: 389.08 hours @ $225.00 hourly = $87,543.00

Attorney Borgmann: 509.55 hours @ $190.00 hourly = $96,814.50

Attorney Camp: 168 hours @ $175.00 hourly = $29,400.00

Attorney Labinger: 212.4 hours @ $225.00 hourly = $47,790.00

*Total District Court Fees Awarded:* $261,547.50

---

4. As Plaintiffs concede in their supporting memoranda, due to the early date of this constitutional challenge, "the only 'partial-birth abortion' case [Plaintiffs' attorneys] could have worked on before Rhode Island was Michigan." Plaintiffs' Supporting Memoranda at 8. While Plaintiffs' attorneys have stated in their declarations that they did indeed perform work in the Michigan case, the magistrate judge correctly noted that they were not listed as counsel of record. This Court is unprepared to rule that involvement in one previous case makes an attorney sufficiently expert in an area of law to warrant the imposition of out-of-town rates for his or her services.

*Costs Awarded:*

ACLU–RFP Attorneys: $20,659.18

Attorney Labinger: $917.94

*Total District Court Costs Awarded:* $21,577.12

 *TOTAL: $283,124.62*

*First Circuit Court of Appeals*

*Attorneys' Fees Awarded:*

Attorney Weiss: 25.83 hours @ $225.00 hourly = $5,811.75

Attorney Borgmann: 116.5 hours @ $190.00 hourly = $22,135.00

Attorney Camp: 45.25 hours @ $175.00 hourly = $7,918.75

Attorney Labinger: no compensation

*Total First Circuit Fees Awarded:* $35,865.50

*Costs Awarded:*

ACLU–RFP Attorneys: $1,640.23

Attorney Labinger: no compensation

*Total First Circuit Costs Awarded:* $1,640.23

 *TOTAL: $37,505.73*

**GRAND TOTAL AWARDED PLAINTIFFS: $320,630.35**

The total amount due Plaintiffs for fees and costs in this litigation, therefore, is increased to $320,360.35. Plaintiffs' other objections are overruled as stated herein. The Clerk shall enter judgment for the Plaintiffs in that total amount, forthwith.

It is so ordered.

### REPORT AND RECOMMENDATION

ROBERT W. LOVEGREEN, United States Magistrate Judge.

In this matter, the plaintiffs, alleging they are prevailing parties in this litiga-

tion, seek counsel fees pursuant to 42 U.S.C. § 1988 for the legal work performed in the district court in the amount of $471,695.50 and costs in the amount of $21,577.12 for a total of $493,272.62.

Additionally, the plaintiffs, again alleging that they were the prevailing parties in the appeal in the First Circuit, seek counsel fees pursuant to 42 U.S.C. § 1988 for the legal work performed in the First Circuit in the amount of $99,756.50 and costs in the amount of $1,724.90 for a total of $101,481.40.

Both motions for counsel fees and costs have been referred to a magistrate judge for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule 32(c). A hearing on both motions was held on July 10, 2003. Based upon the court's review of the legal memoranda, the oral arguments, and independent research, I recommend that attorneys' fees and costs be awarded as follows:

*Legal Work Performed Before the District Court*

 ACLU–RFP—$213,757.50 (attorneys' fees) and $20,659.18 (costs) for a total of $234,416.68

 Attorney Labinger—$47,790.00 (attorneys' fees) and $917.94 (costs) for a total of $48,707.94.

*Legal Work Performed Before the Circuit Court*

 ACLU–RFP—$34,360.50 (attorneys' fees) and $1,640.23 (costs) for a total of $36,000.73.

 Attorney Labinger—no award.

#### Background

This litigation[5] commenced with the plaintiffs launching a constitutional attack

---

5. The district court decision is *Rhode Island*

*Medical Soc. v. Whitehouse,* 66 F.Supp.2d 288

on a state statute attempting to ban partial birth abortions, R.I. Gen. Laws § 23–4.12. At the district court level, the plaintiffs, two obstetricians and two medical related groups, were represented by Lynette J. Labinger ("Attorney Labinger") as local counsel and by Catherine Weiss ("Attorney Weiss"), Caitlin Borgmann ("Attorney Borgmann"), and Talcott Camp ("Attorney Camp") who are associated with the Reproductive Freedom Project, American Civil Liberties Union Foundation. The defendants, the then Attorney General and Governor of the State of Rhode Island, were represented by Rebecca Tedford Partington ("Attorney Partington") for the Attorney General and Claire J.V. Richards ("Attorney Richards") for the Governor.

At the First Circuit level, the plaintiffs were again represented by the same counsel and an additional attorney Jessie Hill ("Attorney Hill"). While both defendants initiated the appeal, the Attorney General later withdrew his appeal based upon a then recent decision of the United States Supreme Court. However, the Governor continued with the appeal and was represented by his Executive Counsel, Joseph S. Larisa, Jr. ("Attorney Larisa"), his Deputy Executive Counsel, Claire Richards, and Thomas M. Dickinson ("Attorney Dickinson") of the law firm of Pine & Cantor.

In the district court, in July 1997, almost immediately following the passage of the state statute, the plaintiffs were successful in obtaining a temporary restraining order ("TRO") which enjoined the defendants from enforcing the state statute. At some point in 1998, the Rhode Island General Assembly amended the state statute and the litigation was stayed pending that amendment process. However, the TRO remained in effect and, subsequent to the amendment, the TRO was applied to the amended state statute and remained in effect throughout the litigation until the district court's decision on August 30, 1999 when the district court issued a permanent injunction against the enforcement of the state statute as amended.

The supposed purpose of the state statute was to ban a single procedure known as the D & X procedure, but the state statute's definition of that procedure did not conform to the medical definition thereof. The plaintiffs, quite correctly as the results of this litigation demonstrate, were concerned that the state statute covered more than just the D & X procedure and, in fact, threatened the performance of constitutionally protected abortions. Hence this litigation commenced and the plaintiffs raised numerous constitutional objections including, *inter alia*, the definition of partial birth abortion contained in the state statute is too vague and infringes on protected procedures, the state statute fails to provide for an exception for the mother's health, the state statute contains an inadequate "mother's life" exception, and the civil remedies provided in the state statute place an undue burden on a woman's right to an abortion. These constitutional objections were considered and accepted by the district court and formed the basis for its permanent injunction. The plaintiffs also raised other issues including a legitimate state interest argument which raised equal protection and substantive due process questions. The district court declined to address these issues as they were not relevant to the litigation. *Id.* at 295.

After awaiting the expiration of the stay period due to the amendment process, conducting discovery, and preparation for trial, the district court heard testimony in a

(D.R.I.1999). It is a lengthy, detailed and well-written decision and the reader is referred thereto for further background in this matter.

bench trial during the period May 3–6, 1999. The district court heard medical testimony from three witnesses who were certified as experts in abortion practice: Dr. Pablo Rodriguez, a plaintiff, Dr. Phillip Stubblefield of Boston Medical Center, and the defense witness, Dr. Frank Boehm of Vanderbilt University Hospital.

During the course of the litigation, the defendants challenged the plaintiffs' standing to bring this action as it was determined that no Rhode Island doctor (including both plaintiffs/doctors) had ever performed an abortion using the D & X procedure and that there was no evidence that an abortion using the D & X procedure had even been performed in Rhode Island. *Id.* at 298. The district court, after an exhaustive discussion of standing, found that all plaintiffs had the requisite standing to bring this action. *Id.* at 301–04. The district court also noted that four other federal district courts [6] had reviewed state laws similar to Rhode Island's attempted ban on partial abortion. *Id.* at 300. In all cases, appeals had been taken to the applicable Circuit Court and awaited decision therefrom. In all four district court decisions, the state statutes were declared unconstitutional. Some of the plaintiffs' counsel here also participated in one or more of these four cases.

In the end, the plaintiffs prevailed on four of their constitutional challenges and the district court declined to reach the arguments on substantive due process and equal protection. *Id.* at 316. The plaintiffs did not lose any of their arguments, rather, as to two arguments, the district court simply declined to address them as they were not relevant or necessary to the determination of the litigation.

As previously stated, the district court found that the state statute had four distinct constitutional flaws. The district court did not decide whether a state could ban the D & X procedure, but did find that the state statute failed to do that. A permanent injunction was issued against the enforcement of the state's ban on partial birth abortion. *Id.* at 317.

Thereafter, the defendants appealed the district court's decision to the First Circuit. At some point during the appeal, the United States Supreme Court decided *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). *Stenberg* decided the fate of the Nebraska statute which was very similar to Rhode Island's. That fate was to declare the Nebraska statute unconstitutional. Thereafter, one of the defendants, then Attorney General Whitehouse, withdrew his appeal. However, then Governor Almond pursued his appeal, but limited his appeal to a narrow issue. Governor Almond did not contest the merits of the district court's determination, but did argue that since none of the plaintiffs perform D & X abortion procedures, no plaintiff had the standing to challenge the state statute as to post-viability abortions. *Rhode Island Medical Soc. v. Whitehouse,* 239 F.3d 104, 105 (1st Cir.2001). Therefore, the district court erred in enjoining any post-viability application of the state statute. This argument had been made in similar form and rejected in the district court. The First Circuit stated, after cancelling the scheduled oral argument, that the state statute's definition of the D & X procedure did not distinguish between pre and post-viability abortion procedures and "what [Governor Almond] seeks to do is to

---

**6.** These cases included *Richmond Med. Ctr. v. Gilmore,* 55 F.Supp.2d 441 (E.D.Va.1999); *Planned Parenthood v. Miller,* 30 F.Supp.2d 1157 (S.D.Iowa 1998); *Planned Parenthood v.* *Verniero,* 41 F.Supp.2d 478 (D.N.J.1998); and *Eubanks v. Stengel,* 28 F.Supp.2d 1024 (W.D.Ky.1998).

sever an unconstitutional application of the [state statute] from, what he contends would be, a constitutional application." *Id.* at 106. The First Circuit discussed severability and determined that the state statute was not susceptible to severance as the manner in which it was written was not clear as to what applied pre and post-viability. The First Circuit rejected the governor's claim in a brief per curiam decision and affirmed the judgment of the district court. Shortly thereafter, the First Circuit denied the Governor's petition for rehearing and suggestion for rehearing en banc. That action ended this litigation.

In July 2001, the plaintiffs moved for attorneys' fees and related costs in the district court and in the First Circuit [7]. The district court referred its motion to a magistrate judge and a hearing was held on January 23, 2002. Subsequently, the First Circuit referred its motion to the district court which referred it to the magistrate judge. A new hearing was noticed as to both motions and was held on July 10, 2003.

## Discussion

The United States Supreme Court stated in *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), that "[a] request for attorney's fees should not result in a second major litigation." While the district court must exercise some supervision and review over these requests, it need not perform a line-by-line review of attorney time records or "drown in a rising tide of fee-generated minutiae." *United States v. Metropolitan Dist. Comm'n.,* 847 F.2d 12, 15 (1st Cir.1988).

### A. Prevailing Party

Under 42 U.S.C. § 1988, a prevailing party is entitled to recover attorneys' fees unless "special circumstances would render such an award unjust." *Pontarelli v. Stone,* 781 F.Supp. 114, 119 (D.R.I.1992), appeal dismissed, 978 F.2d 773 (1st Cir.1992) (citations omitted). Plaintiffs are defined as prevailing when they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978), overruled on other grounds by *Richardson v. Miller,* 279 F.3d 1, 4 (1st Cir.2002). In short, "a plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *see also Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."). In the case at bar, the plaintiffs can demonstrate that they succeeded on significant issues in the litigation and achieved the benefit they sought in bringing the suit. The district court granted a permanent injunction against the defendants in favor of the plaintiffs. As a result of the plaintiffs' efforts, the State of Rhode Island is no longer enforcing R.I. Gen. Laws § 23–4.12. Consequently, the plaintiffs constitute "prevailing parties" for purposes of calculating attorneys' fees.

---

**7.** The ACLU–RFP does not charge its clients legal fees directly. If successful, attorneys' fees are sought from the losing party(s) pursuant to some statutory authority. If unsuccessful, the ACLU–RFP goes uncompensated.

## B. Lodestar Approach

The Supreme Court of the United States and the First Circuit use the lodestar approach to calculate attorneys' fees. The lodestar approach multiplies the number of hours reasonably expended on the litigation times a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Andrade v. Jamestown Housing Authority,* 82 F.3d 1179, 1190 (1st Cir.1996); *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992). The courts have deemed the lodestar fee presumptively reasonable, although it is subject to an upward or downward adjustment in certain circumstances. *See Lipsett v. Blanco,* 975 F.2d at 937 (citing *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

To calculate the reasonable hours expended, courts ascertain the time counsel actually spent on the case "and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Id.* (quoting *Grendel's Den. Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984)). For example, "[t]he time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'" *Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir. 1986) (quoting *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977)); *see also Lipsett v. Blanco,* 975 F.2d at 938 ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism.") (citations omitted). In addition, "[c]lerical or secretarial tasks ought not to be billed at lawyer's rates, even if a lawyer performs them." *Lipsett v. Blanco,* 975 F.2d at 940 (citing *Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)).

To determine the reasonable hourly rate, courts utilize the "prevailing market rates in the relevant community...." *Andrade v. Jamestown Housing Authority,* 82 F.3d at 1190; *see also Blum v. Stenson,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541 (defining "prevailing market rates" as "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation"); *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 19 (1st Cir.1988) (stating that courts look to the "prevailing rates in the community for comparably qualified attorneys"). The district court is not obligated to adopt the petitioning attorney's customary billing rate or what that attorney asserts is the prevailing rate in the community. *See Andrade v. Jamestown Housing Authority,* 82 F.3d at 1190. On the contrary, the district court is "entitled to rely upon its own knowledge of attorney's fees in its surrounding area...." *Id.* (citing *Nydam v. Lennerton,* 948 F.2d 808, 812–13 (1st Cir.1991); *United States v. Metropolitan Dist. Comm'n,* 847 F.2d at 19).

The party requesting attorney's fees maintains the burden of providing sufficient documentation and "evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *O'Rourke v. City of Providence,* 77 F.Supp.2d 258, 263 (D.R.I.1999) (quoting *Hensley v. Eckerhart,* 461 U.S. at 433, 103 S.Ct. 1933), aff'd in part and rev'd in part, 235 F.3d 713 (2001). The documentation must constitute a "full and specific accounting of the tasks performed, the dates of the performance, and the number of hours spent on each task." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 527 (1st Cir. 1991) (citations omitted). The rationale for requiring a full and specific accounting is to allow the District Court "to gage whether the task performed was warrant-

ed," and whether "the time factor allocated was appropriate or excessive." *Tennessee Gas Pipeline Co. v. 104 Acres of Land*, 32 F.3d 632, 634 (1st Cir.1994).

### C. Upward or Downward Departure

Calculating the lodestar equation does not terminate the inquiry into the fee award. The District Court may adjust the fee upward or downward depending on other factors, including the results obtained. *See Hensley v. Eckerhart*, 461 U.S. at 434, 103 S.Ct. 1933. The result obtained is

> particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Id.* On the other hand, to avoid double counting, "considerations concerning the quality of a prevailing counsel's representation normally are reflected in the reasonable hourly rate" and therefore, "the overall quality of performance ordinarily should not be used to adjust the lodestar" to remove "any danger of 'double counting.'" *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). To attain an upward adjustment, the fee applicant has the burden of proving that such an adjustment is necessary. *See Blum v. Stenson*, 465 U.S. at 898, 104 S.Ct. 1541.

In *Sherwood Brands of Rhode Island, Inc. v. Smith Enterprises, Inc.*, C.A. 00–287T, 2002 WL 32157515, \*\*1–2 (D.R.I.

September 3, 2002), unpublished, at 2–3, the court stated:

> Following the calculation of the lodestar, the Court may, in its discretion, allow for limited upward or downward adjustments. *Id.* at 951, 104 S.Ct. 1541; *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933. Such adjustments may allow for " 'delay in payment, quality of representation (i.e., an unusually good or poor performance above or below the skill already reflected in the hourly rates), exceptional (and unexpected) results obtained, etc.' " *Grendel's Den*, 749 F.2d at 951 (quoting *Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir.1980)).

In determining the lodestar amount, a district court "may calculate the lodestar amount based upon its own estimation of reasonable time necessary to perform tasks at issue, and a compensation rate for a competent lawyer in performing those tasks." *Id.* at 2002 WL 32157515, \*1.

### D. Application

#### 1. Request for Fees by Attorneys Weiss, Borgmann, and Camp for Legal Work in the District Court

Attorney Weiss seeks compensation for 425.23 hours; Attorney Borgmann requests compensation for 697.75 hours; and Attorney Camp asks this court to compensate her for 263.00 hours. Each attorney has submitted a Declaration providing background information regarding their legal education, training, and experience. Coupled with that information, these attorneys have supplied a breakdown of their work by date, work performed, hours expended, and hours actually billed. A summary for each attorney is in order.

*Attorney Weiss*

Attorney Weiss was the Director of the American Civil Liberties Union's Repro-

ductive Freedom Project ("ACLU–RFP") and the lead counsel for the plaintiffs. The ACLU–RFP, as counsel or *amicus,* was involved in seven challenges to various statutes banning partial birth abortions and Attorney Weiss, as Director, supervised all seven. She played a role in the early litigations in developing legal strategies and theories and has devoted her legal career to litigating reproductive rights cases. She is a 1987 graduate of Yale Law School and clerked for a Circuit Court judge. Thereafter, she joined the ACLU and became Director of Litigation for the ACLU–RFP in 1992 and Director in 1997. She has been involved in litigation concerning various reproductive rights issues and states that "I have developed a special expertise in working with abortion providers as well as other medical experts and an understanding of the medical facts surrounding their practice. In addition, I have an extensive knowledge of the relevant federal and state constitutional case law in this field." Weiss Declaration at ¶ 6.

In this litigation, Attorney Weiss was lead counsel and assigned tasks to other counsel and, generally, devised the legal strategies and theories. She had primary responsibility for preparation of the pleadings and the affidavits supporting the plaintiffs' request for a TRO and for the briefs submitted to the district court. She appeared on behalf of the plaintiffs during several motion hearings in district court and was deeply engaged in the discovery process. She was lead counsel during the trial and participated in the drafting of the post-trial and reply briefs. Although Attorney Weiss recorded 520.52 hours of legal time on this matter, she pared that number to 425.23 in the exercise of billing judgment to eliminate any duplicative or unnecessary effort. Attorney Weiss requests the court apply an hourly rate of $350 for a total of $148,830.50.

### Attorney Borgmann

Attorney Borgmann is the State Legislative coordinator for ACLU–RFP and was an attorney for the plaintiffs in this matter. Attorney Borgmann is a 1991 graduate of New York University Law School and, thereafter, clerked for a federal district judge. She then became associated with a large New York City law firm and, in 1997, joined the ACLU–RFP. Beginning in 1997, Attorney Borgmann analyzed, wrote on, and advised affiliates concerning various "partial birth abortion bans" including Rhode Island's. Prior to joining ACLU–RFP full-time, Attorney Borgmann worked on some reproductive rights cases (legal research and drafting) for ACLU–RFP including when she was a law student and as a cooperating attorney. In the instant case, Attorney Borgmann's work included "much of the factual development, and the bulk of the drafting." Borgmann Declaration at ¶ 6. She also prepared witnesses for their depositions and "defended" those depositions. At trial, Attorney Borgmann presented the testimonies from three doctors. During the pretrial stage, Attorney Borgmann presented argument on the motions to stay, to amend the complaint and to continue the TRO. Although the records of the ACLU–RFP state that Attorney Borgmann worked 949.25 hours on this matter, she requests only compensation for 697.75 hours due to reductions for any duplicative or unnecessary work and for tasks that could have been performed by a more junior attorney. Attorney Borgmann seeks an hourly rate of $300.00 for a total of $209,325.00.

### Attorney Camp

Attorney Camp is a staff attorney for the ACLU–RFP and was at the time this matter was filed and tried. She also prepared the principal Declaration in support of this attorneys' fee request. She has

been a staff attorney since 1996. Prior to filing the Rhode Island challenge, Attorney Camp stated she worked on the ACLU–RFP's challenges to the Michigan, New Jersey, Idaho and Kentucky [8] partial birth abortion bans. Attorney Camp is a 1994 graduate of Columbia Law School and then clerked for a Justice of the New Jersey Supreme Court. In this matter, Attorney Camp drafted the brief in support of the TRO and preliminary injunction; worked with Drs. Stubblefield and Rodriguez on their affidavits; prepared Dr. Stubblefield for a hearing on the preliminary injunction; amended the complaint after the statute was amended; conducted the cross-examination of Dr. Boehm; prepared cross-examination for another medical defense witness who was later withdrawn; and drafted a portion of the post-trial brief. Attorney Camp stated that while other attorneys at the ACLU–RFP also provided legal assistance on this matter, no compensation for their time is sought. Attorney Camp expended a total of 666.50 hours in this matter, but reduced that to 263.00 hours. She requests an hourly rate of $250.00 for a total of $65,750.00.

## 2. Request for Fees by Local Counsel, Attorney Labinger, for Legal Work in the District Court.

Attorney Labinger acted as Local Counsel for the plaintiffs as required by Local Rule 5(c). Attorney Labinger is a 1974 graduate of New York University Law School and was a law clerk to then Chief Judge Raymond J. Pettine of this court. In 2000, she was inducted as a Fellow of the American College of Trial Lawyers. In private practice, Attorney Labinger has been engaged in litigation involving civil

rights and/or constitutional law. On many occasions, Attorney Labinger has served as cooperating counsel for the Rhode Island Affiliate of the ACLU including matters involving abortion issues. She testified in the Rhode Island Senate against the legislation that was ultimately passed by the General Assembly and formed the basis for this law suit. She reviewed the testimony in Congress related to the federal statute on the partial birth abortion ban. Attorney Labinger opined that in order to develop the legal challenge to the Rhode Island statute, she would need to possess detailed knowledge concerning the various methods of performing abortions. When she agreed to act as cooperating counsel for the Rhode Island Affiliate of the ACLU, Attorney Labinger did not possess "sufficient expertise as to the necessary medical knowledge and its interplay with legal precedent to serve as lead counsel in this constitutional challenge and that there was no attorney in Rhode Island who did." Labinger Affidavit at ¶ 10. She did not and does not now limit her practice to reproductive rights challenges and knows of no other Rhode Island attorney who does. Consequently, she worked with the ACLU–RFP in this matter to develop legal strategies in this challenge, with the ACLU–RFP counsel to be lead counsel. Attorney Labinger stated that "I had a much more active role in the development and presentation of the challenge at both the trial and appellate levels, providing my experience and knowledge as a civil rights litigator, and in developing strategies as to presentation or argument in written motions and briefs and at hearings and trial and in the development and presentation of evidence at trial." Labinger Affidavit at

---

**8.** Although Attorney Camp claims she "filed" the Michigan case and was "counsel" in that matter, that she "filed" the New Jersey case, and that she "worked with" expert witnesses in the Kentucky and Idaho cases, she appears as counsel of record only in the New Jersey litigation.

¶ 12. Attorney Labinger stated that no time spent by her law partner or her paralegal was included in her hours and her time was reduced in other areas. She requests an hourly rate of $225 [9] for her 212.40 hours for a total of $47,790.00.

### Prevailing Party

To recover attorneys' fees under 42 U.S.C. § 1988, a plaintiff must be a "prevailing party." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). " '[P]laintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *Id.* (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978)). In other words, a plaintiff "need not achieve total victory in order to be deemed a 'prevailing' party." *Pontarelli v. Stone*, 781 F.Supp. 114, 119 (D.R.I.1992). Once plaintiffs cross the threshold of establishing themselves as "prevailing parties," the trial court has the discretion to decide what fees are reasonable. *Id.* at 120.

The plaintiffs argue that, subsequent to the filing of this matter, the district court entered a TRO on July 11, 1997 which continued after the statute was amended and remained in effect until the court's final decision, following trial, when a permanent injunction against the enforcement of the statute entered. Therefore, they are "the prevailing parties in this matter and are entitled to their reasonable attorneys' fees and costs under 42 U.S.C. § 1988." Plfs.' Motion at 2.

The defendants do not dispute that the plaintiffs are prevailing parties and are entitled to "reasonable" fees that do not include time for duplicative, unproductive, excessive, or unnecessary legal work. Defs.' Mem. at 4.

Consequently, this court finds that the plaintiffs are the prevailing party and, as such, are entitled to reasonable attorney fees.

### Hours Reasonably Expended in the District Court

To calculate the reasonable hours expended, courts ascertain the time counsel actually spent on the case "and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Lipsett*, 975 F.2d at 937 (quoting *Grendel's Den. Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984)). For example, "[t]he time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.' " *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986) (quoting *King v. Greenblatt*, 560 F.2d 1024, 1027 (1st Cir.1977)); *see also Lipsett v. Blanco*, 975 F.2d at 938 ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism.") (citations omitted). In addition, "[c]lerical or secretarial tasks ought not to be billed at lawyer's rates, even if a lawyer performs them." *Lipsett v. Blanco*, 975 F.2d at 940 (citing *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)).

In this matter, between the four counsel for the plaintiffs, there are over 1200 time entries. I do not intend nor do I believe I am required to address each entry. The defendants argue generally that many of the descriptions of legal work are inadequate for the court's review and should be rejected, that the plaintiffs overstaffed

---

9. Prior to July 1, 2002, Attorney Labinger's hourly rate was $200. As of July 1, 2001, it increased to $225.

their counsel, that the time charged was excessive, that some of the legal work was unnecessary, and that certain entries specified in the defendants' opposition to the application for attorneys' fees should be disallowed. I will summarize the legal work of each of the four counsel for the plaintiffs and then state what, if any, time is rejected and the reason therefore.

*Attorney Weiss*

In her Declaration, Attorney Weiss states that she worked a total of 520.52 hours in the district court, but billed only 425.23 hours at a rate of $350.00 per hour for a total of $148,830.50. Weiss Declaration at ¶ 6. Attached to the Declaration is a list of legal work performed by date, description of the work, the hours expended, and the hours actually billed. The time frame is from June 30, 1997 through July 28, 1999. Attorney Weiss stated that she acted as lead counsel and, in that role, she assigned tasks to the other attorneys involved in this matter; decided strategy; framed legal issues; conceptualized, reviewed, and revised pleadings, affidavits, and briefs; handled the supporting documents for the TRO and argued the same in chambers; opposed certifying questions to the Rhode Island Supreme Court; drafted discovery responses; opposed a motion to stay; handled the motion to lift the stay and amend the complaint; defended the deposition of a plaintiff; aided in the preparation of cross-examination of a defense medical expert witness; aided in preparing witnesses for trial; made opening and closing statements at trial and presented the testimony of a plaintiff and argued evidentiary issues; aided in the drafting of the post trial brief and reply; and supervised the other ACLU–RFP counsel.

*Attorney Borgmann*

Attorney Borgmann stated in her Declaration that she was responsible for much of the factual development and the bulk of the drafting. She worked on drafting affidavits in support of the TRO and the preliminary injunction (which was never heard), drafted the original complaint and numerous motions and supporting briefs, discovery responses, the pre-trial memorandum, and the post-trial brief and reply brief. Further, she prepared two medical experts for testimony at trial and defended their depositions. She presented the testimony of these experts and a lay witness at trial. She argued motions related to pre-trial issues. She states that she expended 949.25 hours on this matter and billed only 697.75 hours. She has requested an hourly rate of $300.00 per hour for a total of $209,325.00.

*Attorney Camp*

Attorney Camp stated in her Declaration that the ACLU–RFP counsel drew from legal papers filed in previous partial abortion ban challenges handled by them, at least in part, especially the Michigan and New Jersey cases. Attorney Camp identified in her Declaration those specific duties she had in this matter including drafting the brief in support of the TRO and the preliminary injunction, assisting two doctors with preparing affidavits, preparing a plaintiffs' medical expert for his testimony, working on a draft of the post-trial brief, and preparation of the fee application. The record is also clear that she cross-examined the defense medical expert, Dr. Boehm, at his videotaped deposition and prepared to cross-examine another defense expert, Dr. Bowes, who was ultimately withdrawn as a witness.

*Attorney Labinger*

Attorney Labinger acted as local counsel in this matter, but actually played a more active role in the development and presentation of the challenge at trial. She provided her substantial experience as a civil rights litigator and assisted in developing

strategies as to the presentation of argument in written motions and briefs and at hearings and in the development and presentation of evidence at trial. She expended a total of 241.30 hours in this matter and billed a total of 212.40 hours. She requested an hourly rate of $225.00 per hour for a total of $47,790.00.

As stated, I have reviewed the entries of each of the four attorneys involved for the plaintiffs in this matter. While I strongly commend said counsel for the exercise of sound billing judgment in reducing their expenditure of hours, I believe there remains a bit more fat on this roast which needs to be carved therefrom. I will identify the hours generally by attorney and state my reason for eliminating those hours.

*Attorney Weiss*

While I believe that there were numerous meetings, conferences, and sessions on this matter between Attorneys Weiss, Borgmann, and Camp which perhaps were not totally necessary, I fully understand that this was an area of law not well developed and, due to the limited litigation experience of Attorneys Borgmann and Camp, were made necessary, at least initially, in order to present the plaintiffs' claims to the court. However, some of Attorney Weiss' time appears to me to be quite excessive or the description of the work is such that I cannot properly review the work and the need therefor. On October 22, 1998, Attorney Weiss lists 10.5 hours for "Drafting/researching reply". There is no explanation as to what was being replied to, although a careful search of the entries by this court leads to the conclusion that the reply was to the opposition of the defendants to the plaintiffs' motion for preliminary injunction. In total, Attorney Weiss lists 26.82 hours expended in producing the reply brief and this is after expending considerable time on the original brief. I find this quite excessive and reduce that amount to 15 hours. On October 27, 1998, Attorney Weiss lists 0.83 hours for "Gathering material and Organizing team". That description is too vague and the time is eliminated. On November 11 and 12, 1998, Attorney Weiss lists 2.75 hours for "Reviewing F. Boehm responses". The court is not advised as to what responses were reviewed or why. Attorney Camp also spent 14.50 hours in early to mid-November 1998 working on these same "responses" without any explanation as to what responses were reviewed and the necessity for this. Attorney Weiss' time is eliminated.

On May 3, 1999, the first day of trial, Attorney Weiss lists 14 hours of legal work and bills for 12.50 hours. She lists 5 hours for trial time (which is correct) and then 6.75 hours for "Evidentiary issues; getting in excluded evidence; P. Rodriguez redirect". Handling evidentiary issues and conducting redirect would have had to take place during the trial time. This appears to be double billing and 6.75 hours are eliminated. On May 4, 1999,(the second day of trial), Attorney Weiss lists 4 hours of trial time and 4.50 hours for "Evidentiary matters; response to F. Boehm offer; P. Stubblefield redirect; drafting response to anticipated motion for judgment on partial findings". These matters should have occurred during the trial time and drafting a response to an anticipated (but never materializing) motion is unnecessary. I will eliminate 4.50 hours. On May 5, 1999, day three of the trial, Attorney Weiss lists 1 hour for "To court-evidence, etc." That entry is meaningless and the 1 hour is eliminated. On July 26, 1999, Attorney Weiss lists 8.50 hours for "Reading reply and revising" and on July 28, 1999, she lists 6.25 hours for "Reading/revising reply". I assume this is the reply to the

defendants' post-trial brief. This is on top of Attorney Borgmann spending 121.50 hours working on the post-trial brief and Attorney Camp spending 55 hours doing the same. In all, the ACLU–RFP counsel spent approximately 190 hours preparing, researching, drafting and revising that brief. That time is substantially excessive and I will eliminate 8.50 hours of Attorney Weiss' time on this task. In total then, I believe 36.15 hours of Attorney Weiss' time should be eliminated for a new total of 389.08 chargeable hours.

*Attorney Borgmann*

As I stated earlier, I feel that the litigation experience of Attorney Borgmann is such that she expended substantial time doing rather simple tasks for any experienced litigator. Also, much of her time was spent on a learning curve as the ACLU–RFP was using this matter to educate Attorney Borgmann in litigation generally and this type of case specifically. Not all of this time should be compensated by the defendants. In addition, the description of the legal work performed by Attorney Borgmann is, in many instances, deficient and I am unable to make any meaningful review. Those time entries will be eliminated. On July 3, 1997, Attorney Borgmann spent 7.50 hours on "Numerous team strategy meetings; drafted affidavit of medical witness who later withdrew". I see no need for numerous team strategy meetings, especially when the Rhode Island case was, at least, the fourth such case handled by ACLU–RFP and no need to charge for work performed on behalf of a witness that later withdrew. That is unnecessary legal work and the description of "Numerous team strategy meetings" is too vague. The 7.50 hours will be eliminated. Also, the 1.50 hours spent on July 3, 1997 for the affidavit of the withdrawn witness will be eliminated. On July 4, 1997 (which is a federal holi-

day), Attorney Borgmann stated she spent 10.00 hours on the affidavit for the withdrawn witness, reviewing an affidavit from a plaintiff, "misc. tasks", and reviewing bodily integrity materials. The time for the withdrawn witness, the unnamed misc. tasks, and the bodily integrity materials (unexplained) will be eliminated. Consequently, only 1.00 hour will be counted for reviewing a plaintiff's affidavit. Attorney Borgmann would have been more productive if she had spent the day viewing the fireworks. On July 5, 1997, she spent 5.50 hours drafting the complaint and another 6.00 hours on July 6, 1997 drafting the complaint and revising affidavit of withdrawn witness or talking with that witness. On July 7, 1997, she spent 8.50 hours discussing the complaint and revising it along with "team strategy meetings" and reviewing affidavits. On July 8, 1997, she spent 6.50 hours discussing and revising the complaint plus more "numerous team strategy meetings and receiving telephone calls from home". Again, this case would have represented at least the fourth challenge to a partial abortion ban statute which the plaintiffs have stated were similar in each state. This is an area where the ACLU–RFP has claimed an expertise. Spending this much time drafting the complaint in at least the fourth such litigation is grossly excessive. Of this time, I will allow 12 hours for drafting, discussing and revising the complaint plus the other described legal work. The remainder will be eliminated.

On July 18, 1997, Attorney Borgmann charged 2.0 hours for "Located and reviewed Mich. questions and cross-examinations for possible questions; began to draft questions". There is no explanation as to what questions were involved and why draft questions were necessary if they existed in the Michigan case. Also, on July 20, 21, 22, 23 and 24, 1997, 8.50 hours were spent on drafting witness questions with-

out any explanation for their necessity. What questions, what witnesses, what proceeding? All of this time, 10.50 hours, will be eliminated. On July 24, 1997, she charged 1.0 hours for "Team strategy meetings" without any explanation as to who was present, what was discussed and the necessity. This time is eliminated. On July 25, 1997, 0.5 hours was spent concerning the withdrawn witness and on October 30, 1997, 1.50 hours was similarly spent. This time is eliminated. On November 5 and 6, 1997, she spent 1.0 hour typing notes. This is not legal work and is eliminated. On December 10, 1997, she worked in part on an expert report for the withdrawn witness. I will eliminate 1 hour of this time. On June 19, July 7 and 8, 1998, Attorney Borgmann spent 13.50 hours drafting a motion to amend the complaint and a supporting memorandum. There was also some work on a motion and brief to lift the stay. A motion to amend and a supporting memorandum is the most basic legal work in litigation. The time spent is excessive and will be reduced to 5 hours. In late July through mid-August 1998, she charged 25.75 hours in opposing the defendants' motion to dismiss and spent 21.75 additional hours for which no charge was made. This is excessive time even when only the charged time is considered. I will reduce the charged time to 15 hours. In early September 1998, she charged 8 hours for preparation for oral argument and gathering materials. It is unclear as to what oral argument was involved. The entire hearing lasted less than 1 hour and this time is excessive. It will be reduced by 4 hours. On September 4 and 8, 1998, she spent 3.50 hours for "strategy" meetings. At some point, the strategy meetings must be tapered off and I will eliminate this time as unnecessary. During September 1998, Attorney Borgmann charged 30.5 hours for work on preparing documents (including affidavits) for the preliminary injunction and spent considerably more time which was not charged. This is excessive, especially when the court continued the TRO during the course of the litigation until decision. I will eliminate all time above 20 hours. In late September/early October 1998, Attorney Borgmann charged 10.5 hours for preparation of witness questions without any explanation as to what witnesses, for what procedure, and the necessity to have written questions beforehand. This time is eliminated. On October 5, 1998, she charged 2.0 hours for preparing a plaintiff and the withdrawn witness. I will eliminate 1 hour charged for the withdrawn witness. In late October 1998, Attorney Borgmann charged 29.5 hours (she spent 52 hours) preparing a reply brief on the preliminary injunction motion. This is very excessive and all but 12 hours is eliminated.

In January 1999, Attorney Borgmann spent 12.25 hours and charged for 11.75 hours in the preparation for and the defense of Dr. Migliori's deposition. She charged 8.75 hours in the "preparation" of this deposition, 1.50 hours meeting with Dr. Migliori prior to his deposition, and 1.50 hours attending the deposition. A total of 8.75 hours for "preparation" under the circumstances where meeting with the deponent and attending the deposition took only 3 hours is excessive. This is especially true where much of the time spent in preparing for the depositions of Drs. Stubblefield (the plaintiffs' medical expert who had been used in previous cases on this issue) and Rodriguez was not charged. *See* Attorney Borgmann's time records for November 8 and 17, 1998. I will eliminate 5.75 hours as excessive. In late April 1999, Attorney Borgmann charged more than 38 hours in preparation for the testimony of Dr. Stubblefield, and, to some extent, the testimony of M.

Struck, a lay witness, when his deposition had been taken only 3 months earlier. This included writing out questions which must have been asked at the deposition. This is quite excessive and will be reduced to 10 hours. During the trial, specifically on May 3, 1999, Attorney Borgmann included 5 hours for trial time. She spent 12.5 hours in preparation and team meetings and rewriting questions for two witnesses (Dr. Stubblefield and M. Struck). She charged 7 of these hours although her records reflect that she would have worked 17.5 hours that day. I cannot accept that she worked those hours and that all were necessary. While preparation is necessary and prudent during trial, these hours are excessive and I will eliminate 3 of the preparation hours. I also add that on May 3, 1999, Attorneys Weiss and Labinger each billed 5 hours for trial time. I believe this is appropriate as Attorney Weiss delivered the opening statement and was lead counsel. Attorney Labinger was local counsel and required by the local rules to be present. Attorney Camp was present, but did not charge for her time.

On May 4, 1999, Attorney Borgmann spent 14.5 hours on this matter, but charged for 11 hours. These hours included 4 hours for the trial time and 7 hours for mostly team meetings. That seems excessive and the need for these team meetings is unexplained. I will reduce this time by 4 hours. On May 5, 1999, Attorney Borgmann spent 10 hours including 5 hours of trial time, only 2.5 hours of which was charged and 3 hours for further work on questions for Dr. Stubblefield and a meeting re: same. This is unnecessary and excessive when the other similar hours are included. I will reduce this time by 1.5 hours. On May 6, 1999, Attorney Borgmann was present at trial, but made no charge for her time as, on this day, she was only an observer. Attorney Borgmann commenced drafting the post-trial brief in late May through late June 1999. She spent 122 hours working on the post-trial brief and charged for 71 hours. Commencing in late July 1999, she worked on the plaintiffs' reply brief and spent 71.5 hours thereon and charged for 40.5 hours. I fully acknowledge that the district court opined that the briefs from both sides were very well done, in fact, they were "sterling" and that the reply brief "was written with devastating clarity." 66 F.Supp.2d at 316. This does not eliminate the need for the plaintiffs to demonstrate the necessity for this time and work. A total of 111.5 hours to write these briefs seems exorbitant even giving counsel their due that the briefs were extremely well done. I factor that into this Recommendation, but still am of the opinion that 111.5 hours is excessive. I find that a more reasonable time would be 80 hours or approximately two weeks of an attorney's full time. In total then, I believe 188 hours of Attorney Borgmann's time should be eliminated for a new total of 509.55 chargeable hours.

*Attorney Camp*

I have carefully reviewed Attorney Camp's time records and conclude that in many instances she did not charge any time for much of her legal work on this matter. I do find a few entries that I find include excessive, unnecessary or duplicative time, or the description of the work is vague and I am not able to make a meaningful review. On July 24, 25, 26, and 28, 1997, Attorney Camp spent 24 hours working on Dr. Stubblefield's "practice deposition questions", prepping Dr. Stubblefield, traveling to and from New York, reading his "material/articles", and reading his "fax material." *See* Attorney Camp's time records at 3. I am puzzled by this as there is no explanation as to why this was necessary (his deposition was not taken until January 1999) and why it took so much

time. I will eliminate these hours. In late October through mid-November 1998 (and on January 19, 1998), Attorney Camp spent 27 hours on "Pulled NJ prior testimony to refute W. Bowes Aff.", checked prior testimony for W. Bowes extract, "W. Bowes circulating draft", "Started drafting W. Bowes cross examination." Presumably, this work was done in preparation for Dr. Bowes' (defense medical expert) deposition although the time records do not so state. In any event, the deposition was never taken and Dr. Bowes was not presented as a witness. Nevertheless, Attorney Camp was justified in preparing for Dr. Bowes' testimony since, at one point, he was expected to be a witness. But 27 hours of "pulling" prior testimony, etc. is excessive. I will reduce that amount to 12 hours which is a fair and reasonable time for this legal work as he had testified before in cases wherein the ACLU–RFP had participated as counsel and his testimony should have been familiar to counsel.

In late October 1998 through early November 1998, Attorney Camp charged 26.75 hours for legal work on "Pulled multiple prior testimony to refute F. Boehm Aff.", draft response, "re-do F. Boehm response to make thematic, not chronological", edit response, and incorporate edits. This record does not reflect why this was necessary and what the response was for. I am unable to make a reasonable review of this work and time and, therefore, it is eliminated. Likewise, in January and early February 1999, Attorney Camp charged 12.5 hours to prepare the cross-examination for Dr. Boehm, 8 hours traveling to and from Nashville and 5 hours at Dr. Boehm's deposition. I find that some preparation time for Dr. Boehm's deposition was necessary, but in light of the time spent a few months earlier on reviewing his prior testimony, etc., this is somewhat excessive. I will eliminate 4.5 hours of the preparation time. I find the 5 hours spent

at the deposition to be fair and reasonable as Attorney Camp had the responsibility for this deposition. However, I find it troubling that 8 hours of travel time was charged to and from Nashville. Certainly, it would be most unusual for any litigator to accumulate this much "down" time and conduct no legal work that could be billed. I will eliminate 4 of the travel hours.

In mid-April 1999 through early May 1999, Attorney Camp commenced preparations for Dr. Bowes' cross-examination. She charged 20 hours for this preparation, but spent 26 hours on this task. As stated, Dr. Bowes did not testify, but Attorney Camp was unaware that this would occur, nor could she foresee this event. However, 20 hours is excessive when one recalls that in October/November 1998, she spent 27 hours preparing for this cross-examination by reviewing his past testimony, etc. Consequently, I will eliminate 8 hours of the 1999 time spent on preparation for cross-examination of Dr. Bowes. In June 1999, subsequent to the trial, Attorney Camp charged 8 hours for research into whether a clinic license could "be revoked for felony/crime", whether Planned Parenthood could be criminally liable, and criminal liability of a corporation. There is no explanation as to why this research was necessary and how it related to this litigation. I will eliminate this time. Also, Attorney Camp charged 5 hours for research on "intend natural & probable consequences of action." There is no explanation as to why this was done and how it related to this litigation. I will eliminate these 5 hours. Attorney Camp charged 17.5 hours in the preparation of the application for attorneys' fees and costs. I do not believe any of this time should be eliminated as the application is detailed with extensive time records and affidavits, as well as a supporting memorandum. The charged time is fair and reasonable.

In total then, I find that 95 hours of Attorney Camp's time should be eliminated for a new total of 168 chargeable hours.

*Attorney Labinger*

Attorney Labinger served as the local counsel in this matter before the district court. As such, she was required to become involved in all aspects of the matter and be prepared to step in if out-of-town counsel were unavailable. Indeed, Attorney Labinger's role went well beyond that of local counsel and she provided litigation expertise and other invaluable assistance to this matter. Additionally, local counsel is required to sign all pleadings and this court cannot fault Attorney Labinger for her prudent review of all pleadings, her research into various areas of relevant law, and her conferences with counsel of record in order to fulfill her role and not permit the filing of improper documents or arguments.

This court has reviewed all of the time and work entries made by Attorney Labinger and can find none that is unnecessary, duplicative or excessive. The defendants argue that local counsel should either take a back seat role or there is no need for out-of-town counsel. This court disagrees. Local Rule 5(c) does not permit local counsel to "go along for the ride" and this is the type of litigation where multiple counsel would not only be prudent, but necessary. I find the defendants' arguments as to local counsel to be meritless. After full review, I find that Attorney Labinger's request for 212.4 hours of billable time to be fair and reasonable.

**Hourly Rates**

To determine a "reasonable hourly rate," courts must "tak[e] into account the 'prevailing rates in the community for comparably qualified attorneys.'" *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992). As indicated above, "[i]n determining a reasonable hourly rate, the Supreme Court has recommended that courts use 'the prevailing market rates in the relevant community' as the starting point." *Andrade v. Jamestown Housing Authority,* 82 F.3d at 1190 (quoting *Blum v. Stenson,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541). The *Blum* Court defined "prevailing market rates" as those "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541. The court need not rely upon the information presented by the parties. Rather, "the court is entitled to rely upon its own knowledge of attorney's fees in its surrounding area in arriving at a reasonable hourly rate...." *Andrade,* 82 F.3d at 1190 (citing *Nydam v. Lennerton,* 948 F.2d 808, 812–13 (1st Cir.1991); *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 19 (1st Cir.1988)); *see also Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 8 (1st Cir.1993) ("[A] district court, in fixing a reasonable fee award, is not bound by the hourly rate requested by the victor's counsel; rather, the court may establish a rate that it considers reasonable based on counsel's skill and experience and prevailing market rates.").

This writer is fully conversant with the prevailing hourly rates for litigators in the Providence, Rhode Island area, having been a litigator for nearly 30 years prior to becoming a Magistrate Judge. Additionally, this writer has kept current with this issue in settlement conferences and with other contact with counsel in this area. Certainly, the hourly rates requested by Attorneys Weiss, Borgmann, and Camp are excessive when compared to hourly rates in this area during the time frame over which this litigation occurred and currently. The plaintiffs argue that "[c]ourts must thus determine the rate that lawyers of similar skill, reputation and experience

would charge fee-paying clients in similarly complex litigation in the relevant geographic area." Plfs.' Mem. at 14 (citing to *Blum*, 465 U.S. at 895–96, 104 S.Ct. 1541)(" '[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.").

The plaintiffs raise the issue of what is the relevant community. By seeking rates that reflect the New York City prevailing market rates, the plaintiffs seem to argue that New York City is the relevant community since that is where the plaintiffs' counsel is located. *See* Plfs.' Mem. at 15. The plaintiffs seem to rely upon an unsubstantiated statement that there were no Providence counsel able to litigate the issues in this matter. *Id.* at 16 ("Indeed, the complexities of this case of first impression were such that it required attorneys with expertise in reproductive rights litigation, who were not available in Rhode Island. For that reason, this Court should award the ACLU–RFP attorneys New York City rates."); *id.* at 9 ("The ACLU–RFP attorneys and Ms. Labinger agreed to work on the case together because no counsel in Rhode Island had the necessary expertise to litigate this type of action."). The plaintiffs cite to various decisions in support of the requested New York City rates. In *Maceira v. Pagan*, 698 F.2d 38 (1st Cir.1983), the plaintiffs brought an action in the Puerto Rico federal court pursuant to the Landrum–Griffin Act, 29 U.S.C. § 411, against the Union alleging that their rights as Union members were infringed by the Union. The matter was ultimately settled. However, the plaintiffs retained local counsel and also retained a Detroit attorney who specialized in this particular type of litigation. When calculating the fee award to the plaintiffs, the district court awarded a higher hourly rate

to the Detroit attorney than a local (San Juan) counsel would have received. The Union appealed and the First Circuit stated that "the answer to this question turns on the reasonableness of hiring an out-of-town specialist. . . . [A]n out-of-town specialist may be able to command a somewhat higher price for his talents, both because of his specialty and because he is likely to be from a larger city, where rates are higher." *Id.* at 40. However, the Court stated that "[i]f the client hires a local specialist, he will ordinarily pay a premium rate. Where it is unreasonable to select a higher priced outside attorney—as, for example, in an ordinary case requiring no specialized abilities not amply reflected among local lawyers—the local rate is the appropriate yardstick." *Id.* The Court found that the Detroit attorney specialized in Landrum–Griffin Act and Union dissident issues and that there was no evidence that there were "available lawyers with his degree of experience and specialization in Puerto Rico, or, if so, that they charged significantly lower fees." *Id.*

In *Williams v. Poulos*, 1995 WL 281451, 1995 U.S.App. LEXIS 10667 (1st Cir.1995), the plaintiffs filed a complaint in the Maine federal court alleging illegal wiretapping in violation of 18 U.S.C. § 2511(1) and a state statute and obtained substantial relief. Subsequently, the federal court awarded the plaintiffs attorneys' fees and expenses pursuant to the federal and state statutes and both sides appealed to the First Circuit. As to the hourly rates, the First Circuit approved the district court's use of local hourly rates rather than the prevailing hourly rates in Washington, D.C., the location of one of the plaintiffs' law firms. The Court stated that "out-of-town rates may be applied if the complexities of a particular case require the particular expertise of non-local counsel or 'when the case is an undesirable one which capable

attorneys within the forum community are not willing to prosecute or defend.'" *Id.* at **4–5, 1995 U.S.App. LEXIS 10667, 11–12 (citations omitted).

In *Yankee Candle Co. v. Bridgewater Candle Co., LLC,* 140 F.Supp.2d 111 (D.Mass.2001), the plaintiff had filed claims under the Copyright Act, the Lanham Act, a state statute and some common law claims concerning certain scented candles it manufactured. The defendant prevailed on summary judgment motions and sought an award for attorneys' fees and costs. The defendant, a South Carolina located entity, retained a Boston law firm to defend it in the federal court in Springfield, Massachusetts. The prevailing hourly rates for Boston counsel exceeded the prevailing hourly rates for Springfield counsel and the plaintiff objected to the use of Boston hourly rates. The district court remarked that this was an intellectual property case which required specialized work and, therefore, "a reasonable rate in the attorney's city of origin will be awarded." *Id.* at 123.

In *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169 (4th Cir.1994), the plaintiff sought an injunction against the West Virginia State Police and Governor and sought to have two state statutes declared unconstitutional. The plaintiff prevailed and sought an award of attorneys' fees pursuant to 42 U.S.C. § 1988. Some of the plaintiff's counsel were located in Richmond, Virginia and sought hourly rates prevailing in Richmond, although the trial occurred in West Virginia. The defendants objected to the use of out-of-town rates. The Fourth Circuit stated

> "the community in which the court sits is the first place to look to in evaluating the prevailing market rate. Rates charged by attorneys in other cities, however, may be considered when 'the complexity and specialized

nature of a case may mean that no attorney, with the required skills, is available locally,' and the party choosing the attorney from elsewhere acted reasonably in making the choice." *Id.* at 179.

All of these cases include the general theme that the out-of-town attorney(s) has specialized legal skills required in the litigation and that such skills were not available in the local bar. In other words, the out-of-town counsel must have substantial experience with the legal issues involved in what is obviously complex litigation, must possess the requisite legal skills (i.e., must be experienced in litigating said issues in a courtroom), and there is no local attorney with the same or similar experience or skills. However, in the instant matter, none of the ACLU–RFP counsel fit this description. While all had some experience with reproductive rights generally, none had the requisite experience with issues dealing with partial birth abortion bans and attempts to declare such statutes unconstitutional. For example, Attorney Weiss' declaration stated she was the Director of ACLU–RFP since 1997 (the year that this case was filed) and was lead counsel in this matter. While she was involved in partial birth abortion ban cases in the development and legal strategy areas, she appeared as an attorney of record in only one—the Kentucky case, *Eubanks v. Stengel.* She was not an attorney of record in either the Michigan or New Jersey challenges. Consequently, at best, prior to the instant litigation, Attorney Weiss had experience, as one of several counsel, in one particular litigation involving partial birth abortion ban challenges.

As for Attorney Borgmann, she had no prior experience before the filing of this matter in any litigation involving partial birth abortion ban challenges. She was not an attorney of record in any of the

prior decisions that this court can find. According to her declaration, she commenced her full-time position with the ACLU–RFP in 1997, the year this matter was filed. While she lectured and advised on partial birth abortion ban challenges to ACLU affiliates, this case appears to be the first actual litigation regarding a partial birth abortion ban challenge in which she has participated.

Attorney Camp's Declaration states that she has been a litigator with the ACLU–RFP since 1996. She states that she was involved in the Michigan case, but the decision does not list her as an attorney of record. That decision lists the ACLU–RFP as one of several counsel representing the plaintiffs in that case, but the only particular ACLU–RFP attorney listed is an Attorney Melling who was not involved with the instant matter. Attorney Camp was involved in the New Jersey matter, *Planned Parenthood v. Viniero*, where she handled the cross-examination of the defense medical witnesses, which is the same role she played in the instant matter with the same witnesses (Dr. Bowes was later withdrawn). Attorney Camp was listed as an attorney of record in that matter. She was not listed as an attorney of record in the Kentucky case, but her name appears on the complaint filed in the Idaho case.

Taking these Declarations together, the ACLU–RFP seeks attorneys' fees for counsel who previously had very minimal, if any, experience in the actual litigation of partial birth abortion ban challenges. While these counsel had some general knowledge of abortion procedures and

practices, they had almost no experience in partial birth abortions and in litigating challenges to statutory bans thereof. This background does not suggest, or even infer, that they are experts in this area and in the litigation of related issues. One trial or a lecture does not an expert make. This is especially true where, as here, the counsel repeatedly refer to this litigation as "a case of first impression". *See, e.g.*, Plfs.' Mem. at 16. It is illogical to argue that these counsel have experience and expertise in an issue of first impression so that it was not only necessary but reasonable to retain them. This is not to suggest that ACLU–RFP counsel did not perform in this litigation in an exemplary fashion and with competence. They did and, in doing so, well served this community by advocating permanent injunctive relief as to an unconstitutional statute. But, prior to this matter commencing, they did not have the litigation expertise, experience, and specialization that warranted retaining them to the exclusion of local counsel. In fact, local counsel had a greater litigation expertise than all of the ACLU–RFP counsel.

While this court does not dispute that Providence counsel, at the commencement of this litigation, may not have possessed the same medical knowledge concerning how abortions were performed in general that the plaintiffs' counsel possessed, this court most vociferously disputes that at that time there were no Providence counsel with the same or better requisite legal skills possessed by New York counsel [10].

---

**10.** I do not read Attorney Labinger's affidavit to state that she did not possess the requisite legal skills to handle this litigation. This court is patently aware of Ms. Labinger's legal skills and she is a very able and competent counsel well experienced so as to handle this matter. Attorney Labinger's affidavit stated:

9. I was asked by the RI–ACLU to serve as cooperating counsel in the event that the legislation was enacted into law. Based upon my review of the proposed legislation and the arguments against its constitutionality, it became clear to me that, in order to appropriately develop the legal challenge to the constitutionality of a "partial-birth

Indeed, this court is aware of a number of Providence area attorneys/law firms that possessed the requisite legal skills, i.e., they were skilled, accomplished, and very experienced litigators. And any one of these attorneys could have obtained the necessary medical knowledge by doing exactly what the plaintiffs' counsel did—meet with medical personnel, including · plaintiffs, who actually perform abortions in Rhode Island and obtain the required medical. information and opinions from them. While this court cannot state that the plaintiffs did not act reasonably in retaining counsel such as the ACLU–RFP, this record is completely silent as to how this counsel was chosen. However, it can be reasonably inferred from this record [11] that the plaintiffs sought legal assistance from the ACLU Rhode Island affiliate who contacted Attorney Labinger, one of many cooperating attorneys with the Rhode Island affiliate. Attorney Labinger's only concern was her lack of necessary medical knowledge concerning partial birth abortions in order to mount a constitutional challenge. She did offer her many and very competent legal skills before the Rhode Island affiliate referred the matter

to the ACLU–RFP. But this does not mean that no Providence area counsel lacked the requisite legal skills. Indeed, this record supports the finding that the Rhode Island affiliate made no further attempts to retain local counsel to handle this litigation before referring it to the ACLU–RFP. Also, based upon New York counsels' Declarations, even the ACLU–RFP lacked the necessary medical knowledge concerning partial birth abortions as they also met with knowledgeable physicians to obtain the necessary medical background. And, according to these Declarations, litigation concerning partial birth abortion bans was quite new and the first case was in Michigan [12] and was decided in 1997. This was followed by a Kentucky decision and a New Jersey decision in 1998 [13]. · Rhode Island followed with a trial and decision in 1999. This court's review of those decisions reveals that the ACLU–RFP was involved with other local counsel in each matter with Staff Attorney Melling (not involved in this matter) assisting in the representation of the plaintiffs in the Michigan case, Staff Attorneys Weiss (involved as lead counsel in this matter) and Parker (involved in a portion of this matter

abortion" law, plaintiffs' attorney(s) must be intimately familiar with the medical facts specific to the different termination procedures available and indicated at various stages in the first, second, and third trimesters and the interplay of the medical facts and the legal precedent in the area.
10. Both at the time that I agreed to serve as cooperating counsel for the RI–ACLU in challenging the partial-birth abortion statute (if enacted into law) and as of this writing, I was and am convinced that I did not possess sufficient expertise as to the necessary medical knowledge and its interplay with legal precedent to serve as lead counsel in this constitutional challenge and that there was no attorney in Rhode Island who did. In making this statement, I believe that I am and was then aware of the members of the Rhode Island "civil rights" bar and of attorneys who had previously

participated in reproductive rights challenges. To my understanding, there was not in 1997, or now, any attorney in Rhode Island who concentrates his or her practice in the field of defending reproductive rights. In fact, I believe that, as of 1997, I had served as lead or sole counsel for all of the RI–ACLU–sponsored court cases challenging restrictions on reproductive rights since 1980, the last of which concluded in 1986, over ten years earlier.

11. See Declaration of Attorney Labinger at 4.

12. See Evans v. Kelley, 977 F.Supp. 1283 (E.D.Mich.1997).

13. See Eubanks v. Stengel, 28 F.Supp.2d 1024 (W.D.Ky.1998) and Planned Parenthood v. Verniero, 41 F.Supp.2d 478 (D.N.J.1998).

but no charge made therefore) assisting in the representation of the plaintiffs in the Kentucky case, and Staff Attorney Camp (involved in this matter) assisting in the representation of the plaintiffs in the New Jersey case. Therefore, at the time the Rhode Island trial was held, Attorney Weiss had assisted in one partial birth abortion ban case, Attorney Camp had assisted in one partial birth abortion ban case (New Jersey) and performed some unknown legal work in the Idaho case, and Attorney Borgmann had not participated in any partial birth abortion ban case. This level of experience hardly makes these attorneys "experts" in partial birth abortion bans litigation or possessing "expertise" on this issue that created such legal skills that no Providence area counsel could match them. I cannot conclude and, therefore, reject any argument that the ACLU–RFP counsel was chosen because "the complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally." *Rum Creek Coal Sales, Inc.*, 31 F.3d at 179.

I am further troubled by the fact that, based upon this record, this case is the first in which the ACLU–RFP counsel have sought New York City rates. In the Michigan case, in a Declaration dated September 12, 1997 filed in support of an application for attorneys' fees therein, the ACLU–RFP did not seek New York City rates and Attorney Camp requested for her legal work an hourly rate of $135.00 which she described as "a reasonable hourly rate in Detroit." Defs.' Appendix at Exhibit C. Attorney Camp also requested an hourly rate of $60.00 for her legal work which would be appropriate for a paralegal. *Id.* This Declaration was filed after the Rhode Island litigation had commenced. In the New Jersey case, the ACLU–RFP was one of several counsel representing plaintiffs and an application for attorneys' fees was filed by Attorney

Camp on behalf of all counsel for the plaintiffs. The ACLU–RFP did not seek New York City rates, but chose to accept the local rates in Trenton, New Jersey. In that fee application, Attorney Camp filed a supporting Declaration dated November 17, 2000 wherein she requested an hourly rate of $200.00. Defs.' Appendix at Exhibit D. She further stated that although Attorney Weiss had expended approximately 80 hours in legal work on that case, no compensation was being sought for that legal work. Since Attorney Camp's legal work in the Rhode Island litigation occurred in 1997–1999, an hourly rate between $135.00 and $200.00 would be in order.

I find that the hourly rates to be applied in this application for attorneys' fees are those rates in the Providence area. I am convinced beyond cavil that there exists in the Providence area counsel that possess the legal skills necessary to this litigation and whose legal experience at least equals that of the ACLU–RFP counsel. Perhaps it is less certain that such counsel would possess the level of medical knowledge necessary for this matter, but such counsel could readily obtain the necessary medical knowledge by meeting with medical personnel who perform abortions. This is what the ACLU–RFP counsel did. While I do not dispute the reasonableness of the New York City rates urged by the plaintiffs, they are not applicable here. I do find that the requested hourly rate for Attorney Labinger is most fair and reasonable. Her time will be awarded an hourly rate of $225.00. Attorney Labinger has been an attorney for almost 30 years, is a very accomplished litigator, has handled numerous "complex" litigations, and was recently inducted as a Fellow of the American College of Trial Lawyers.

Attorney Weiss has been an attorney for almost 14 years and was lead counsel in

this matter and responsible for the presentation of testimony, exhibits, and the written briefs, although she had other counsel assisting her. She has experience in litigating reproductive rights issues in general, and had a role in one previous matter involving a challenge to a partial birth abortion ban statute. She has had substantial responsibility as Director of Litigation for the ACLU–RFP and as Director of the ACLU–RFP. Based upon her experience and her skills as exhibited in this matter, I find that an hourly rate of $225.00 would be fair and reasonable for her legal work in this matter.

Attorney Borgmann has been an attorney for almost 12 years and has held the full-time position of State Legislative Coordinator for the ACLU–RFP since 1997. In that position, she provides "legal and strategic advice to ACLU affiliates and others around the country opposing [state laws affecting reproductive choice] laws in their legislatures . . . ." Borgmann Decl. at ¶ 3. She also analyzes various state laws concerning reproductive rights, conducts workshops, presents lectures, and testifies before state legislatures. Prior to this matter, the record does not reflect any involvement by Attorney Borgmann in litigation concerning a challenge to a partial birth abortion ban statute. Consequently, I find that an hourly rate of $190.00 would be fair and reasonable for her legal work in this matter.

Attorney Camp has been an attorney for almost nine years and has been a litigator with the ACLU–RFP since 1996. While her Declaration states that she was one of the attorneys in the Michigan case, she is not listed as an attorney of record in the decision. She did state, in a Declaration filed in the Michigan court in support of an application for counsel fees, that she examined one of the plaintiffs' medical expert witnesses and cross-examined two of the

defense medical experts. She is listed as one of the attorneys of record in the New Jersey case, where her role, as here, was to cross-examine the defense medical experts. She has had some involvement in reproductive rights litigation, the exact extent of which in unknown, but not in the specific area of partial birth abortion except for the New Jersey matter. For an attorney with her experience level and years at the bar, I find that a fair and reasonable hourly rate is $175.00 for her legal work in this matter.

These hourly rates are intended to apply to all legal work, in-court and out-of-court, and reflect the quality of the work and the delay in payment. In summary, the hourly rates assigned to the ACLU–RFP and to local counsel are as follows:

| | |
|---|---|
| Attorney Weiss | $225.00 hourly |
| Attorney Borgmann | $190.00 hourly |
| Attorney Camp | $175.00 hourly |
| Attorney Labinger | $225.00 hourly |

Consequently, I recommend that the ACLU–RFP and local counsel be awarded the following attorneys' fees for their district court work:

Attorney Weiss—389.08 hours @ $225.00 hourly = $87,543.00

Attorney Borgmann—509.55 hours @ $190.00 hourly = $96,814.50

Attorney Camp—168 hours @ $175.00 hourly = $29,400.00

Attorney Labinger—212.4 hours @ $225.00 hourly = $47,790.00

Total attorneys' fees awarded— $261,547.50

**Upward or Downward Departure**

Calculating the lodestar equation does not terminate the inquiry into the fee award. The District Court may adjust the fee upward or downward depending on

other factors, including the results obtained. *See Hensley v. Eckerhart,* 461 U.S. at 434, 103 S.Ct. 1933. The result obtained is

> particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Id.* On the other hand, to avoid double counting, "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate" and therefore, "the overall quality of performance ordinarily should not be used to adjust the lodestar" to remove "any danger of 'double counting.'" *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. at 566. To attain an upward adjustment, the fee applicant has the burden of proving that such an adjustment is necessary. *See Blum v. Stenson,* 465 U.S. at 898, 104 S.Ct. 1541.

It is incumbent upon counsel to request and justify any departure from the lodestar calculation. Neither counsel, plaintiffs' or defendants', has requested any departure and none will be considered.

**Costs in the District Court**

The ACLU–RFP seeks costs in the amount of $20,659.18. Attorney Labinger seeks costs in the amount of $917.94. Each seeks costs pursuant to 42 U.S.C. § 1988.

The defendants object to these requests for expenses or costs arguing that only those costs defined in 28 U.S.C. § 1920 should be considered and those costs are narrowly defined. Since none of Attorney Labinger's costs fit within the definition offered by § 1920, they should be denied. The defendants argue in a similar vein as to the ACLU–RFP costs involving travel, courier, telephone, copying (no showing of necessity), and some unexplained costs.

> In determining what expenses should be awarded, a court must apply a test of reasonableness and necessity. It is well-established in awarding fees in a civil rights case that "certain out-of-pocket costs incurred by the plaintiffs' attorneys, including transportation, lodging, parking, food and telephone expenses" can be reimbursed as "reasonable and necessary costs and expenses."

*In re Boston and Maine Corporation v. Moore,* 776 F.2d 2, 11 (1st Cir.1985)(quoting *Palmigiano v. Garrahy,* 707 F.2d 636, 637 (1st Cir.1983)).

 In *Palmigiano,* the First Circuit recognized the "unanimous federal circuit authority that the attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party pursuant to 42 U.S.C. § 1988." *Palmigiano v. Garrahy,* 707 F.2d at 637. There, the First Circuit allowed out-of-pocket costs for lodging, transportation, parking, food, and telephone services.

**Attorney Labinger's Costs**

Attorney Labinger seeks costs in the amount of $917.94. These costs include copy charges in the amount of $312.75, transcript charges in the amount of $100.00, Federal Express charges in the amount of $45.00, a filing fee of $150.00 for the United States District Court, messenger charges in the amount of $128.50, parking charges of $3.50, postage charges of $49.26, legal research (Pacer) charges in the amount of $10.80, telephone long dis-

tance charges of $1.64, and Westlaw charges of $116.49. The only objection offered by the defendants to these charges is that they are not included in § 1920. There is no objection as to the amounts. Since I find that these costs were reasonable and necessary to this matter, they are recoverable pursuant to § 1988 and they are allowed in full.

**ACLU–RFP Costs**

The ACLU–RFP seeks costs in the amount of $20,659.18. These costs are broken down as follows: travel, lodging, transportation, and food, primarily for counsel, but also for an expert witness appearing and testifying at trial, in the amount of $10,879.56; deposition transcripts and trial transcripts in the amount of $2,946.70; telephone charges (July 1997—September 1999) in the amount of $1,422.72; copying costs ($.10 per copy) in the amount of $4,127.40; copying costs for outside copy services in the amount of $139.70; and courier services in the amount of $1,143.10.

The defendants object to these costs arguing that they are not included within § 1920. I have already found that § 1988 applies and permits reasonable and necessary costs. The defendants object specifically to the copying costs stating that the number of copies made in-house would be 41,274. This court does not find this number of copies to be excessive in this type of litigation involving two separate counsel for the defendants with the need for copies of documents to go to each, and to the court, and to the local counsel, and to the file for use by the ACLU–RFP counsel. Further, I find these copies to be necessary in this type of litigation. The defendants also object to the expenditure of $129.70 for the enlargement of excerpts of the statute and exhibits, and the expenditure of $10.00 for printing a trial exhibit using "Mosby–Sub web service." Besides

being quite petty, I can conceive of few items more necessary to litigation than graphic aids for the court as to the statute and a few exhibits to be shown to the court. Lastly, the defendants argue that courier expenses to certain named persons should be eliminated, such as "Steven Brown", "Marshall W. Carpenter, M.D.", "Mail Boxers, Inc.", "Susan Closter–Goday", and "Terry O'Neil". The defendants do not provide any reason why these expenses should be eliminated and I decline to do so. Also, the total courier expense for Steven Brown is $88.33. Brown is the Executive Director of the ACLU Rhode Island Affiliate which was assisting counsel in the presentation of this matter. The total courier cost for Marshall W. Carpenter, M.D. is $10.97 and while Dr. Carpenter's identity in this matter may be interesting, it is likely that many physicians were advising the plaintiffs in this matter, including Dr. Carpenter. The total courier cost for Mail Boxers, Inc. is $84.38 and was expended in packaging and shipping large trial exhibits, the necessity for which is quite evident. The total courier cost for Susan Closter–Godoy is $11.55 and she was an attorney with Planned Parenthood whose Rhode Island Affiliate was a plaintiff. I cannot state that this was unnecessary. The total courier cost for Terry O'Neil was $24.97, and while she was not identified, I am satisfied that every other person named as a recipient of courier services was related to this matter, I will make a reasonable inference that Terry O'Neil was also. In short, I find the ACLU–RFP's expenses to be reasonable and necessary and I will allow them in full.

**Summary of District Court Totals**

I recommend that the plaintiffs' motion for attorneys' fees and costs for the district court work be granted and the following fee and costs awards be made:

ACLU–RFP should be awarded attorneys' fees in the amount of $213,757.50 and costs in the amount of $20,659.18 for a total award of $234,416.68.

Attorney Labinger should be awarded attorneys' fees in the amount of $47,790.00 and costs in the amount of $917.94 for a total award of $48,707.94.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court and the right to appeal the district court's decision. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

### Application for Attorneys' Fees and Costs in the First Circuit

As previously stated, the defendants appealed the decision of the district court and, at some point, the appeal was stayed by the First Circuit as the United States Supreme Court had before it for consideration, an appeal concerning the constitutionality of the Nebraska statute which was very similar to the Rhode Island statute. *See Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000).

Following the *Stenberg* decision, the then Attorney General of Rhode Island withdrew his appeal, but the then Governor continued his appeal on a very narrow issue—standing. The Governor did not contest the merits of the district court decision, but raised the issue of whether any of the plaintiffs had standing to bring this action as to post-viability abortions as none had ever performed a partial birth abortion (D & X procedure) and there was some question as to whether such a procedure had ever been performed in Rhode Island. *See Rhode Island Medical Soc. v. Whitehouse,* 239 F.3d 104, 105 (1st Cir. 2001)[14]. As the First Circuit stated:

> [t]his argument is a variation of the standing argument that [the Governor] made below—an argument that was rejected—where he contended that the appellees lacked standing to challenge the Act because none of them performed the procedure which, under [the Governor's] interpretation, was prohibited by the Act.

*Id.*

Consequently, the standing issue was one that had been raised, briefed, argued, and decided in the district court.

There is no dispute that the plaintiffs prevailed in the appeal. The First Circuit affirmed the district court decision finding that standing existed and that the Act was not severable so that an unconstitutional application could be severed therefrom leaving only a constitutional application. *Id.* at 106–07. Having prevailed on the narrow issue raised by the then Governor, the plaintiffs filed this application for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. The plaintiffs seek counsel fees for four attorneys, although five attorneys worked on this matter at the appellate stage[15]. Specifically, the plaintiffs seek fees for the legal work performed in this matter as follows:

Attorney Hours Rate Fee Requested

---

**14.** This was a per curiam decision consisting of approximately two pages in the Federal Reporter 3d.

**15.** Attorneys Weiss, Borgmann, Camp, Labinger and Hill represented the plaintiffs in this appeal. However, the plaintiffs do not seek any fees for Attorney Hill's efforts.

| Weiss | 53.99 | $350 | $18,896.50 |
| Borgmann | 185 | $300 | $55,500.00 |
| Camp | 73 | $250 | $18,250.00 |
| Labinger | 31.60 | $225 | $ 7,110.00 |
| | | Total | $99,756.50 |

The plaintiffs also seek costs in the amount of $ 1,724.90 for a total of attorneys' fees and costs of $101,481.40.

The defendants object raising the arguments that: (1) the plaintiffs' counsels' time includes unreasonable hours in that some of the time is duplicative, unproductive, excessive or unnecessary; (2) that the matter was overstaffed when consideration is given to the issue on appeal and the fact that four attorneys represented the plaintiffs on this appeal; (3) the hourly rates sought are unreasonable and excessive; and the costs sought are not allowable under 28 U.S.C. § 1920.

**Hours Reasonably Expended in the Circuit Court of Appeals**

I have previously stated the standard to be followed when determining reasonable hours (see page 17 of this Report and Recommendation) and I continue to rely upon that standard. In this appeal, the four attorneys for the plaintiffs included over 275 time entries. Again, I do not intend to discuss each one and I do not believe I am required to do so. I will summarize the legal work of each of the four counsel for the plaintiffs and then state what, if any, time is rejected and the reason therefore. Regrettably, there is far more fat on this roast than the district court roast that needs trimming.

*Attorney Weiss*

Attorney Weiss filed a supporting Declaration which basically parrots her Declaration in the district court fee application [16]. The two Declarations were executed the same day. However, she adds that she drafted and filed a motion to stay the appeal pending the Supreme Court's decision in *Stenberg*, and a consented to motion to extend the time to apply for attorneys' fees (this motion consisted of two typewritten double-spaced pages). Thereafter, she drafted and filed the original and reply briefs on the plaintiffs' motion for summary disposition which was ultimately denied. This time was not wasted as the legal work was incorporated into the plaintiffs' opposition brief on appeal. Attorney Weiss stated she supervised the drafting of the plaintiffs' opposition brief which "required considerable original research and drafting because the Governor based his appeal on the novel argument that Plaintiffs lacked standing to challenge the application of the ban to postviability abortions." Weiss Declaration at ¶ 10. She also assisted in preparing Attorney Borgmann for oral argument before the First Circuit before the oral argument was cancelled.

I have carefully reviewed Attorney Weiss' time entries and find many troublesome. On November 2, 1999, Attorney Weiss has an entry "Reading FRAP rules for appdx and stay motion." Counsel should be expected to know the applicable rules, especially counsel that proclaim themselves as having considerable expertise, and, if they do not, they cannot expect their opponent to pay for their learning experience. I will eliminate 0.75 hours. On November 3, 1999, she spent 0.75 hours "Reviewing motions and appendix designations, etc." She previously spent 2.0 hours on these motions (one of which was 2 typewritten pages in length) and there is

---

16. The plaintiffs' attorneys have not charged for any time in drafting their Declarations in support of this application. *See* Attorney Camp's Declaration at 20. I commend them for that act.

no explanation as to why it was necessary to review appendix designations as she was not drafting any brief at that time. This time will be eliminated. On November 8, 1999, she spent 0.25 hours on "Management" with no explanation for its necessity in this matter and that time is eliminated. On November 22, 1999, she spent 0.25 hours on "1st Cir.—stay" with no explanation as to what this work entailed and its necessity. This time is eliminated. Commencing in July 2000 through most of that month, Attorney Weiss spent 8.25 hours discussing, strategizing, reviewing, revising, faxing, responding, and finalizing the motion and brief concerning summary disposition of the appeal. Attorney Weiss did not write that brief (Attorney Borgmann claims she did—*see* Borgmann Declaration at ¶ 6) and 8.25 hours for reviewing the brief is, in my opinion, excessive, especially when Attorneys Labinger and Camp also reviewed this brief. One drafting and three extensive reviews of a brief are not necessary, but are duplicative and excessive. I will eliminate 4.25 hours of this time as I find some review of the brief reasonable. On October 3, 2000, Attorney Weiss spent 0.25 hours on "*J. Hill re: assignment re: facial v. as-applied challenges*" which is unnecessary as Attorney Hill's time was completely written off in this application. This time is eliminated. On November 8, 2000, she spent 0.33 hours on a discussion of an issue not raised in the district court. This is unnecessary and that time is eliminated. Beginning in mid-November 2000 through the end of November, Attorney Weiss charged 27.58 hours reading, revising, discussing, conferring, managing, meeting, proofing, inputting, and assisting on the plaintiffs' opposition brief. This brief was mainly drafted by Attorney Borgmann and was also extensively reviewed by Attorneys Camp (3.25 hours, but only .25 hours charged) and Labinger (5.5 hours charged). Three reviews are

two too many and I will eliminate 17.58 hours of this time as excessive. On January 25 and 29, 2001, Attorney Weiss charged 3.75 hours conferring with Attorney Borgmann "going over questions for argument" and "argument questions." Interestingly enough, Attorney Borgmann's time records do not reflect any time on either date meeting with Attorney Weiss and discussing argument questions. This seems to be nonproductive time, especially since the oral argument was cancelled on or about January 29, 2001, and this time is eliminated.

*Attorney Borgmann*

Attorney Borgmann was the attorney assigned the responsibility for writing the plaintiffs' opposition brief. Her Declaration also parrots the Declaration she filed in the district court application with the exception that she describes her work on the appeal. This work also included the drafting of the brief on the motion for summary disposition. Additionally, it was Attorney Borgmann that was designated to give the oral argument on behalf of the plaintiffs.

I have given a careful review to these time entries and find that some of the time charged is either excessive, unnecessary or duplicative. In January, March, May and July 2000, Attorney Borgmann recorded that she spent 6.50 hours getting, revising drafting, sending, distributing, and discussing "status report" without any explanation as to what status report, to whom it was sent, and the necessity for this time and effort in this matter. I find this time, as described, totally unnecessary and this time will be eliminated. Commencing in mid-July to the end of July 2000, Attorney Borgmann charged 42.75 hours in researching, discussing, meetings, conversations, reading cases, drafting, revising, getting comments, preparing exhibits, and finalizing the summary disposition brief.

This motion was ultimately unsuccessful. However, I cannot find that this motion was unnecessary or nonproductive since, if granted, the case would have been concluded and the legal work and fees ended. But I do find that 42.75 hours is excessive for this work, especially in light of the fact that the issues had been thoroughly briefed below and the only issue raised in the appeal was one of standing which had been raised, thoroughly briefed, and decided below. *See* 66 F.Supp.2d at 301–04. As stated, this motion had a basis for being prepared and filed, but I find that those hours in excess of 25 hours would be unnecessary and excessive and will be eliminated. In October 2000, Attorney Borgmann charged 8.5 hours for "read cases for brief" (3.5 hours) and discussion with Attorney Hill on facial challenges (5.0 hours). While reading cases to be cited in a brief is a necessary and worthy endeavor, I fail to understand why conversations with an Attorney whose time was completely written off[17] is necessary or productive. I will eliminate 5 hours. In November 2000, Attorney Borgmann charged 55.25 hours for reading cases and other sections of the brief, drafting brief, discussing, revising, researching, delegating, putting brief together and distributing, reworking, commenting, cite checking, preparing and filing the plaintiffs' opposition brief. As stated, the issue before the First Circuit was standing or, as stated by the First Circuit, "because appellees do not perform any post-viability abortions, they lack standing to challenge the Act as applied to post-viability abortions." 239 F.3d at 105. Also, as noted by the First Circuit, this was similar to the standing argument made by the defendants in the district court, which issue had been fully briefed for that court, and which the district court discussed in depth and rejected in its decision. *See* 66 F.Supp.2d at 301–04. This issue which had been fully briefed below did not need another 55.25 hours of research, meetings, discussions, etc. to put into the proper form of brief for the First Circuit[18]. This is especially true where three other counsel also reviewed and commented on this brief and, based upon this record, this issue was fully briefed in the memorandum supporting the unsuccessful motion for summary disposition and, later, incorporated in the opposition brief. I find this time extremely excessive and totally unnecessary above 30 hours, which I find is quite generous given the amount of time and work spent on this issue below. There is no need to reinvent the wheel when the bulk of the work had been previously performed and counsel had the benefit of the district court's thinking. In mid-January 2001, Attorney Borgmann charged 2.5 hours for discussion with an intern on research re: "legal significance of complaint allegations after trial" and actual research thereon by her. There is no explanation as to the necessity for this and this issue was not addressed by the First Circuit nor does this record reflect that this issue was ever raised before the First Circuit. Consequently, it is unnecessary and this time will be eliminat-

---

**17.** Attorney Hill's time of approximately 140 hours was written off.

**18.** To the extent that this time includes research on issues other than standing, it is unnecessary. The governor's brief raised the issue of standing. There was no need for the plaintiffs to address issues not raised by the Governor on appeal. *See Acevedo Lopez v. Police Dep't of P.R.*, 247 F.3d 26, 29 (1st Cir.2001)(holding that court will not consider claims for which arguments are not presented in the party's brief or at oral argument); *see also United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir.1997)("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation.").

ed. In late January 2001, Attorney Borgmann charged 38 hours for preparation for oral argument. That oral argument was ultimately cancelled by the First Circuit. A per curiam decision followed. While some preparation time for oral argument was necessary and prudent, 38 hours, with more to follow had the oral argument not been cancelled [19], is excessive. Indeed, Attorney Borgmann spent the entire week commencing January 22, 2001 on preparation for oral argument and also spent 5 hours on Sunday, January 28, 2001 doing the same. I will eliminate all hours over 20.

*Attorney Camp*

Attorney Camp followed the familiar pattern of submitting a Declaration parroting the one she filed in district court. In addition, she stated that because "the governor made the novel argument that Plaintiffs lacked standing to challenge application of the ban to postviability abortions", Attorney Camp's Declaration at ¶ 10, this "obligated Plaintiffs to devote significant effort to clarifying the relevant law." *Id.* I find this to be total nonsense. This is not a novel argument as a similar argument was made in the district court and in the supporting memorandum for the motion for summary disposition. It should not require significant effort on the part of plaintiffs' counsel as the issue was briefed earlier. The plaintiffs' counsel may have made this issue into a significant effort, but such action was neither necessary nor productive. Attorney Camp's role in the appeal process was to draft the reply brief on the motion for summary disposition, draft parts of the opposition brief (the facts section), and draft this fee application. While Attorney Camp reports that she spent 135 hours on this appeal, she

seeks to charge only 73 hours. The defendants object to certain of Attorney Camp's time entries. Here, the brief in support of the plaintiffs' motion for summary disposition was drafted in the main by Attorney Borgmann. *See* Attorney Borgmann's Declaration at ¶ 6. For reasons not entirely clear to this court, Attorney Camp was assigned the task of drafting the reply brief. It would seem most inefficient and time consuming to have one attorney draft the main brief and a separate attorney draft the reply brief. This is not an effective and efficient use of legal talent. In early August 2000, Attorney Camp charged 10.50 hours for a conference with Attorneys Borgmann and Weiss on "how to reply to Gov.'s Objections", "research cases Gov. cites for standard for summary disposition", "Research cases: standard for summary disposition", "Drafted Reply to Gov.'s Objections", and "Drafted Motion to direct Gov. to designate properly & for enlargement." There certainly was no need to research the standard for summary disposition when the supporting brief would have covered, at a minimum, that issue. Therefore, all of this time is unnecessary and 4.5 hours will be eliminated. Earlier, on October 18, 1999, Attorney Camp charged 0.5 hours for "Compare FRAP & 1st Cir rules re: brief length, appendix, etc." As I stated previously in a similar entry for another counsel, this is a learning experience activity and should not be charged to the opponent.

In her Declaration, Attorney Camp stated that her principal duties in the appeal process were "drafting Appellees' reply brief in support of summary disposition; drafting parts of Appellees' main brief, including the facts section; and the instant fee application." Attorney Camp

---

**19.** Oral argument had been scheduled for February 5, 2001 and was cancelled on January 29, 2001.

Declaration at ¶ 14. According to Attorney Borgmann's Declaration, her primary responsibilities included drafting "most of Plaintiffs' main appellate brief." Attorney Borgmann's Declaration at ¶ 6. Also, Attorney Weiss' Declaration states "I also supervised the drafting of Plaintiffs' appellate brief." Attorney Weiss' Declaration at ¶ 10. From this, I deduce that Attorneys Borgmann and Camp drafted various unspecified portions of the appellate brief, with the exception of the facts section which Attorney Camp drafted, and Attorney Weiss "supervised" this activity. But I cannot determine which parts of the appellate brief were the responsibility of Attorney Borgmann and which parts were the responsibility of Attorney Camp. In October 2000, Attorney Camp charged 13.5 hours in drafting the "severability" and "post-viability standing" sections of the appellate brief and 15 hours in drafting the "facts" section. Yet, in October and November 2000, Attorney Borgmann spent a very considerable amount of time drafting this brief which included the standing issue and "facial challenge". Their work seems to be duplicative since, at the very least, each is working on the standing issue. Attorney Camp charged at least 9.5 hours on drafting the standing section and Attorney Borgmann charged at least the same amount for work on the standing issue (see, e.g., Attorney Borgmann's time entry for 11/9/00). I will eliminate 9.5 hours as I find this duplicative. In early November 2000, Attorney Camp charged 14.5 hours in drafting the facts section of the appellate brief and reading the trial transcript to find references to "facial challenge" (see, e.g., time entry for 11/13/00). The "facial challenge" issue was thoroughly researched and drafted by Attorney Borgmann and work on that issue performed by Attorney Camp was duplicative. Consequently, I will eliminate 3 hours. On November 15

and 17, 2000, Attorney Camp seems to have performed the same work and charged twice for it. Both entries state that she expended 2 hours in "Found factual findings from district court to add to rest of brief" and note discrepancies. In one entry she placed the information in the facts section and in the other she stated she placed the information in the brief "(other than fact section)". No matter where the information was placed, only 2 hours should have been charged. I will eliminate 2 hours. In late January 2001, Attorney Camp charged 8.25 hours for research on "judicial admissions". There is no explanation as to why this was necessary and it does not appear that this legal research was used in the appellate brief as that had already been filed. Certainly, it was not addressed by the First Circuit. This is unnecessary and this time is eliminated.

### Attorney Labinger

Although no longer required to remain in this matter as local counsel, Attorney Labinger remained in this matter as one of four appellate counsel to the plaintiffs and, based upon this record, at the request of the ACLU–RFP counsel, even though the ACLU–RFP counsel have stated in numerous parts of their memorandum that no Rhode Island counsel had the necessary expertise to handle this litigation. Attorney Labinger engaged in very minimal research and drafting. The vast majority of her work at the appellate level was spent in reviewing and revising the drafts of the plaintiffs' opposition brief and advising and consulting on the Governor's brief and reply and various conversations with ACLU–RFP counsel. The defendants have objected to any compensation for Attorney Labinger's time arguing that her participation at the appellate level was only for the convenience and benefit of the ACLU–RFP counsel and was not neces-

sary to prepare the opposition to the defendants' appeal.

## Use of Multiple Counsel at the Appellate Level

The First Circuit has stated that "[t]he time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'" *Hart v. Bourque,* 798 F.2d at 523 (quoting *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir. 1977)); *see also Lipsett v. Blanco,* 975 F.2d at 938 ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism.") (citations omitted).

At the appellate level, the plaintiffs were represented by four counsel. The defendants argue that four is too many and, at the very least, Attorney Labinger's time should be completely discounted. Here, at the trial level, Attorney Weiss acted as "lead" counsel and made the opening and closing statements and examined Dr. Rodriguez. Attorney Borgmann examined medical experts and a lay witness. Attorney Camp cross-examined the defense medical expert and was prepared to cross-examine the second defense medical expert before he was withdrawn. Each of these attorneys played a role in the trial court so that a valid argument could be made that their work on the appellate level was necessary. Each could contribute to the brief, especially as to their respective roles below.

Regrettably, the same cannot be said for Attorney Labinger's role at the appellate level. At the district court level, she acted as the local counsel, a role that is required by Local Rule 5, and, as usual, she performed in an exemplary fashion. I have no doubt, and this record supports, that her extensive and very able litigation experience was crucial in the plaintiffs' success in the district court. I also have

no doubt that her support and advice at the appellate level was equally valuable. But the question is not whether the ACLU–RFP counsel benefited from her review and advice. They certainly did as did the plaintiffs. The question is whether her participation at the appellate level was necessary. I cannot find that her participation was necessary, even though it greatly benefited the ACLU–RFP counsel. Consequently, I find that all of Attorney Labinger's time at the appellate level must be eliminated.

In summary then, the allowable hours for each counsel are as follows:

| | |
|---|---|
| Attorney Weiss | 25.83 hours |
| Attorney Borgmann | 110.0 hours |
| Attorney Camp | 45.25 hours |
| Attorney Labinger | 0 hours |

## Hourly Rates

I have discussed the determination of hourly rates in great depth at pages 31–44 of this Report and Recommendation. I see no need to repeat this discussion. Suffice it to say that almost uniformly, at least in this district, the same rates charged by counsel for the trial work are charged for any appellate work. Consequently, for the same reasons that I found Providence area hourly rates to be applicable to the work before the district court, I find those rates to be applicable for the appellate work.

Consequently, I recommend that the ACLU–RFP counsel be awarded the following attorneys' fees for their appellate work:

Attorney Weiss—25.83 hours @ $225.00 hourly = $5,811.75

Attorney Borgmann—110.00 hours @ $190.00 hourly = $20,900.00

Attorney Camp—45.25 hours @ $175.00 hourly = $7,918.75

Attorney Labinger—no compensation

Total attorneys' fees awarded to ACLU–RFP counsel: $34,630.50

**Upward or Downward Departure**

I previously stated when discussing the district court work (see pages 44–45 of the Report and Recommendation) that there should be no departure as none was requested. That remains my position regarding the work at the appellate level.

**Costs at the Appellate Level**

Again, there was an extensive discussion of costs for the district court work (see pages 45–48 of the Report and Recommendation) and I rely upon that discussion.

**ACLU–RFP Costs**

The ACLU–RFP seek costs in the amount of $1,640.23. These costs break down as follows: $80.35 for telephone charges; $1,336.50 for copying (at $.10 per page); and courier charges of $409.12. I find all charges to be fair and reasonable and related to this litigation. Consequently, I will allow these costs in full pursuant to 42 U.S.C. § 1988.

**Attorney Labinger's Costs**

In light of the recommendation that Attorney Labinger's entire time for her appellate work be discounted, I will not allow any costs to her.

**Summary of Appellate Court Totals**

I recommend that the plaintiffs' motion for attorneys' fees and costs for the appellate court work be granted and the following fee and costs awards be made:

The ACLU–RFP counsel should be awarded attorneys' fees in the amount of $34,360.50 and costs in the amount of $1,640.23 for a total award of $36,000.73.

I do not recommend an award of attorneys' fees or costs to Attorney Labinger.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court and the right to appeal the district court's decision. *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980).

Aug. 25, 2003.